**UNITED STATES of America, Plaintiff–Appellee,**

v.

**David Lynn FURROW, Defendant–Appellant.**

**No. 99–30232.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 7, 2000

Filed Oct. 12, 2000

James Siebe, Moscow, Idaho, for the defendant-appellant.

Barry McHugh, Assistant United States Attorney, Coeur d'Alene, Idaho, for the plaintiff-appellee.

Before: HUG, Chief Judge, BRUNETTI and GOULD, Circuit Judges.

BRUNETTI, Circuit Judge:

David Furrow appeals his conviction by conditional guilty plea to one count of manufacturing marijuana in violation of 21 U.S.C. § 841(a)(1). Furrow reserved the right to appeal the district court's denial of his motion to suppress evidence found in two preliminary warrantless searches and a third search conducted after police obtained a warrant based on drug evidence discovered in the second search. Furrow claims that the searches violated his Fourth, Fifth, and Fourteenth Amendment rights. This Court has jurisdiction pursuant to 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.

At approximately 9:40 p.m. on March 27, 1998, Officer Jerrie Northrup and several other officers, drove to a residence in rural Benewah County, Idaho where they suspected a teenage party was underway. When they arrived at the main road fronting the property, the officers heard considerable noise coming from the direction of the main residence, which the parties have described as a cabin-like structure. The officers then proceeded up a driveway, approximately 200 to 250 yards, to the house.

When the officers arrived at the top of the driveway, approximately ten to twelve juveniles fled from the scene of a bonfire several yards away from the cabin and ran into the woods. Upon leaving his vehicle, Officer Northrup saw full and empty beer cans and bottles on the ground outside the cabin. Northrup and another officer then went onto the porch of the cabin, looked in a window, and observed several young people inside drinking beer and watching television. Northrup knocked on the door. A male juvenile opened the door, then slammed it in Northrup's face. Through the window, Northrup then observed six to eight juveniles running up the stairs to the second floor. Northrup then "pounded on the door" and yelled that he was from the sheriff's office and that if they did not come outside to talk to him, he would get a search warrant. Eventually, a female juvenile came to the door. She advised Northrup that she wanted to cooperate and would try to get everyone to come outside. She went inside and shortly thereafter, six to eight teenagers came outside, where the officers lined them up so that they could begin checking identification and issuing citations for underage consumption. One or two were found to be in possession of marijuana or marijuana pipes, and were handcuffed and placed in the back of a patrol car. The female juvenile testified at the district court's evidentiary hearing that she indicated to the officers that all of the people who had been inside the house were now out.

Officer Northrup then made a phone call to Benewah County Deputy Prosecuting Attorney Payne. Northrup advised him of the situation and requested a search warrant. The prosecuting attorney told Northrup that there was insufficient information for a warrant, and instead advised him to do a protective sweep of the premises.[1]

Northrup and another officer then entered the cabin. Using flashlights, the officers scanned the dimly lit living room, the same area where Northrup had observed the teenagers sitting and drinking earlier. Northrup testified that during the course of this "protective sweep," he saw, in plain view, two marijuana pipes on a shelf near the bottom of a coffee table. Northrup knelt down and seized the pipes and continued his sweep of the downstairs and upstairs of the cabin. No other juveniles were in the cabin, and the officers saw no other evidence of narcotics. There is considerable dispute about how long this search took. The second officer on the scene testified at the suppression hearing that the sweep took only one to two minutes. However, the female juvenile who had come to the door was waiting in a police car while the officers were inside the cabin, and she testified that they were inside for approximately 25 minutes. The district court judge did not make an explicit finding of fact as to the length of time,

---

1. At the suppression hearing, Officer Northrup testified that when he called Payne to request a warrant

> [Payne] kind of hemmed and hawed and said, well, you know, I told you guys that if you had kids holed up in a house or something and wouldn't come out, we could get a search warrant, but see what else you can find.

Northrup testified that he discussed with Payne the possibility of sealing off the house and getting a warrant

> but [Payne] said to just go ahead and do the protective sweep through the house and then seal off the house.

but stated that the juvenile's judgment about the length of the search "was somewhat suspect."

After completing the sweep, Northrup went outside to talk to the teenagers. At about that time, Isaiah Furrow ("Isaiah"), son of the appellant, appeared in front of the cabin, approached the officers, and identified himself, saying that he was cold and wanted to go inside. Some of the other partygoers had previously told the officers that the house was "Isaiah's". The officers asked Isaiah if they could come inside and talk with him, and he agreed. The district court did not make a finding as to whether Isaiah was aware of the search the police had conducted just prior to his appearance at the cabin.

Once inside, Northrup talked to Isaiah about how the party had developed, and Isaiah said it had just gotten out of control, and admitted that people had been drinking beer and smoking marijuana. Northrup stated that he then asked Isaiah to give him the marijuana, and Isaiah retrieved some marijuana buds and a pipe. Northrup then asked Isaiah if he could search the house. Northrup maintains that Isaiah gave permission for the search. The female juvenile corroborated Northrup's testimony that Isaiah gave his consent for the search of the house. Isaiah testified that Northrup told him that the officers were in the process of getting a search warrant. The district court did not find Isaiah's testimony credible on this point.

The officers then searched the cabin. It was during the course of this warrantless search that Northrup found 13 more marijuana pipes, some marijuana cigarette butts, and an oversized marijuana pipe with resin.

After this search, Northrup asked Isaiah what his last name was and who his parents were. After being informed that Isaiah's last name was Furrow and that his father was David Furrow, Northrup called the county prosecutor again, related the events that had transpired, and told him

that he recognized the name Furrow and had other information about Furrow that led him to believe there was a "marijuana grow" at the house. The prosecuting attorney then told Northrup that he would apply for a warrant.

Payne then made arrangements to appear before a Benewah County Magistrate Judge. In addition to what Northrup had observed, and seized, Payne related to the judge that about two months prior, Northrup had received information from a woman representing herself as Furrow's ex-wife regarding an "underground" grow operation on Furrow's property that had been featured in High Times magazine. Payne also testified that Northrup had received information two months before from a man whose nephew had recently committed suicide, that his nephew had obtained drugs from the Furrow residence. The magistrate judge then issued a search warrant, finding probable cause that evidence of the criminal offense of possession of a controlled substance would be found in the residence and the four outbuildings on the property.

The search warrant was delivered to the officers at Furrow's cabin after midnight. Northrup and the other officers searched the cabin and four outbuildings as authorized by the warrant. Inside the cabin, the officers found more marijuana pipes in various places, tins containing marijuana buds, and a scale like those used in drug operations. After cutting a padlock on one of the outbuildings, located approximately 100 feet from the cabin, the officers found a marijuana grow operation with 147 marijuana plants.

The district court held a three-day suppression hearing. The court then issued an oral ruling on the motion to suppress. The court held that the protective sweep was reasonable. The court found that Isaiah gave consent for the second warrantless search, and that Isaiah's testimony to the contrary was not credible. The court found that the search warrant provided for

a search of the premises and outbuildings, and that the shop building was within the curtilage. The court ruled that a *Franks* hearing was not necessary because there was no evidence that the statements made in support of the warrant regarding the tip from Furrow's ex-wife and the information about a young man who obtained drugs and committed suicide were made recklessly or with intent to falsify the application. The court concluded that even if the warrant had been defective in some respect, the search probably would be valid under the *Leon* good faith exception.

Immediately following the district court's announcement of its ruling on the suppression motion, Furrow tendered a conditional guilty plea preserving his right to appeal the motion to suppress. A Judgment of Conviction was issued and Furrow made this timely appeal.

## II.

This case presents us with a number of interdependent Fourth Amendment questions. In reviewing the district court's denial of the motion to suppress, we consider, in turn, the validity of (1) the initial protective sweep of the cabin, (2) the subsequent consent search of the cabin, (3) the substance and scope of the search warrant, and (4) the search of the outbuildings. If the actions of the officers fail to pass constitutional muster at any juncture in the analysis, then the evidence upon which Furrow's indictment for the intentional manufacture of marijuana is based, namely the 147 marijuana plants and other evidence of a "grow" operation found in the locked shed, must be suppressed.

## A.

■ Our first inquiry is with regard to the first search and is reviewed in the context of the Fourth Amendment. Warrantless searches are presumptively illegal. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). For this Court to uphold a warrantless search, the government must demonstrate both that the officer had probable cause to enter the area to be searched and that exigent circumstances excused the warrant requirement. *United States v. Johnson*, 207 F.3d 538, 544 (9th Cir.2000). Here, Furrow does not contest that the officers had probable cause to believe that a crime was being committed inside the cabin. Our inquiry, therefore, is limited to whether the exigencies of the situation justified the officer's failure to obtain a warrant. We review de novo the question of exigent circumstances. *United States v. McConney*, 728 F.2d 1195, 1205 (9th Cir.1984), abrogated on other grounds by *Estate of Merchant v. C.I.R.*, 947 F.2d 1390, 1392 (9th Cir.1991).

■ The government argues that the initial search of the cabin was a protective sweep. Officer Northrup, in fact, testified that when he called the prosecuting attorney the first time, seeking a search warrant, Payne told him that he could not get a warrant with the evidence they had, but instructed Northrup that he could conduct a "protective sweep" of the premises.

> A "protective sweep" is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding.

*Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

■ We begin by observing that both parties have mischaracterized the question of whether this search falls within an exception to the warrant requirement by framing it in terms of the protective sweep. Their arguments essentially conflate the narrow concept of the protective sweep with the more general idea of the exigent circumstances search. We acknowledge that the protective sweep and exigent circumstances inquiries are related. A specific exigent circumstance, the safety risk to officers presented by unsearched premises, is what permits the

warrantless protective sweep. Exigent circumstances beyond those impairing officer safety, however, permit a much broader category of searches than just the protective sweep. Whatever else this particular search might have been, it was not a protective sweep. There is no evidence that the officers had any concern for their safety or the safety of others, as evidenced by the fact that this "protective sweep" took place *after* the teenagers had all been rounded up, carded, and arrested, and *after* Officer Northrup had placed the telephone call to Payne. It is not reasonable to think that the officer would have placed a call to Payne before entering the cabin if he thought a potentially dangerous suspect was still holed up inside. In *Maryland v. Buie*, the case which defined the protective sweep, the Supreme Court emphasized the precautionary nature of the search, the seriousness of the crime involved, and the need for law enforcement to protect themselves by securing the scene and preventing surprise attacks by co-conspirators. 494 U.S. at 333, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276. The search here was not undertaken under the conditions contemplated by *Buie* as justifying a protective sweep.

 The question is whether this search could be justified under the larger umbrella of exigent circumstances. Exigent circumstances are those "that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *McConney*, 728 F.2d at 1199. We have held that

> the government bears a heavy burden of demonstrating that exceptional circumstances justified departure from the warrant requirement. . . . There must exist specific and articulable facts which, taken together with rational inferences . . ., support the warrantless intrusion. The exigencies must be viewed from the

totality of circumstances known to the officers at the time of the warrantless intrusion.

*United States v. Howard*, 828 F.2d 552, 555 (9th Cir.1987) (internal quotation and citation omitted). The government must also show that a warrant could not have been obtained in time. *Id.*

We hold that the government has failed to carry its heavy burden by showing exigent circumstances. First, the government failed to demonstrate that Northrup had "specific and articulable" facts that led him to infer that any suspects remained in the house. The facts are that the female juvenile represented to him that no one was left inside the house, that Northrup admitted that the number of teenagers who came out matched the approximate number he had observed inside, that the officers carded and arrested the juveniles who came out before thinking to check for others, and that Northrup took the time to call the prosecuting attorney before looking for more suspects inside. All of these facts weigh against the conclusion that the officers here felt that they had to enter the cabin immediately to search for remaining suspects. The government has offered no specific and articulable facts to the contrary. Second, the actions of the officers here are entirely inconsistent with the very nature of "exigency." The elapsed time between the officers' observation of the potentially criminal activity and the search at issue defeats the necessary element of urgency implicit in exigent circumstances. Given all that transpired outside, and Northrup's consultation with Payne, some significant amount of time had already passed since the juveniles had exited the house. In fact, Northrup was calling Payne because he wanted a search warrant, which, presumably, he then would have waited for. This course of conduct completely undermines any contention by the government that the officers could not, or felt they could not, have waited for a warrant. That was exactly what they were planning to do. Even if they had, at

this point, believed that further evidence or other suspects remained inside, they needed only to secure the house from the outside to protect whatever interests they had inside.

The government has therefore failed to show facts excusing the warrant requirement. Accordingly, we hold that the initial entry and search by the officers was constitutionally impermissible under the Fourth Amendment.

### B.

We now turn to the question of whether the warrantless consent search conducted subsequent to the initial illegality can be upheld. For the evidence seized in this search to be admissible, the government must establish both that the consent was voluntarily given for purposes of the Fifth Amendment, and that the prior illegal entry has not tainted the subsequent consent thereby subjecting the evidence to exclusion under the Fourth Amendment. We begin with the Fifth Amendment analysis.

### 1.

■■■■ A warrantless search may be justified by proof of voluntary consent by the defendant or another party who has joint access or control of the property. *United States v. Childs*, 944 F.2d 491, 494 (9th Cir.1991). The parties do not dispute that Isaiah had the authority to consent to a search of the residence. We decide only whether that consent was voluntary. A district court's determination of whether a person voluntarily consented to a search depends on a totality of the circumstances and is a question of fact reviewed under a clearly erroneous standard. *United States v. Albrektsen*, 151 F.3d 951, 953 (9th Cir. 1998).

■■■■ We agree with the district court that Isaiah voluntarily consented to the search of the cabin. Among factors to be considered in determining the voluntariness of the search are: (1) whether the defendant was in custody, (2) whether the

arresting officers had their guns drawn, (3) whether Miranda warnings had been given, (4) whether the defendant was told he had a right not to consent, and (5) whether the defendant had been told a search warrant could be obtained. *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1989). Here, the district court did not find Isaiah's testimony about his consent credible. The court specifically found that Isaiah had not been threatened, and that the police officers had not told him they had a search warrant on the way. The court cited the corroborating testimony of the female juvenile, the fact that Isaiah was cooperating with the police, and that the circumstances did not necessitate the use of threats by the officers, as evidence that the consent was voluntary. The finding of voluntariness by the district court is supported by the record and is not clearly erroneous.

### 2.

■■■■ For purposes of the Fourth Amendment, a determination that a consent was voluntarily made "only satisfies a threshold requirement." *United States v. George*, 883 F.2d 1407, 1415 (9th Cir.1989). The mere fact of voluntariness does not mean that a consent is not tainted by a prior Fourth Amendment violation. *United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1299 (9th Cir.1988). Having determined that the consent given for the search was voluntary for purposes of the Fifth Amendment, we must decide whether, nevertheless, the evidence is subject to exclusion under the Fourth Amendment as the fruit of the prior unconstitutional entry. Our main consideration in undertaking this evaluation is whether the consent given is "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *George*, 883 F.2d at 1416 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). "Dissipation of the taint resulting from an illegal entry ordinarily involves showing that there was some significant

intervening time, space, or event." *United States v. Buchanan,* 904 F.2d 349, 356 (6th Cir.1990) (internal quotation and citation omitted).

This court has previously held an illegal protective sweep or exigent circumstances search taints a subsequent consent to search. *United States v. Suarez,* 902 F.2d 1466, 1468 (9th Cir.1990); *Howard,* 828 F.2d at 556. Those cases, however, involved facts somewhat different from those before this court. In *Howard,* narcotics agents burst into the residence of the defendant with guns drawn and proceeded to secure the residence. The agents subsequently obtained consent from the defendant's wife, who was present in the residence during the raid, to search the house and garage. *Id.* at 554. We found that the government had not shown exigent circumstances justifying the initial entry and search. *Id.* at 555. We further found that this illegal entry tainted the subsequent consent to search, and that such consent was therefore invalid. *Id.* at 556. Likewise, in *Suarez,* we held that where there were not exigent circumstances justifying protective sweep of a residence, the subsequent consent of a resident to search the apartment was tainted. *Id.* at 1468.

▆▆▆ In both *Howard* and *Suarez,* we found it unnecessary to undertake an analysis of whether the consent given was voluntary because it was tainted by the illegal prior search. The principle that an illegal entry taints a subsequent consent search is limited, however, to cases where the evidence shows that the illegality is so connected to the subsequent consent so as to render the consent ineffective. In *Howard* and *Suarez,* for example, the party who offered consent to a search had witnessed the illegal entry. The consent, although perhaps voluntary, was a product of the antecedent constitutional violation. In such a case, a person might reasonably think that refusing to consent to a search of his home when he knows that the police have, in fact, already conducted a search of his home, would be a bit like closing the barn door after the horse is out. If, however, the unconstitutional search is sufficiently attenuated from the subsequent consent, the evidence will not be suppressed. *United States v. Taheri,* 648 F.2d 598, 601 (9th Cir.1981); *Wong Sun,* 371 U.S. at 486, 83 S.Ct. 407. If a person was completely unaware of the illegal entry, his ability to consent would be unimpaired, and the taint would be effectively purged. A party unaware that the police might have already seen incriminating evidence would be in the same posture for considering whether to consent to a search as a person not previously subject to an illegal entry. Lack of knowledge of a prior search is an intervening factor which dissipates the coercion inherent in a request for consent made after an unconstitutional search. Under such circumstances, the consent rendered would be "independent of the violation to such a degree as to cause a break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation." *United States v. Vega,* 221 F.3d 789, 801 (5th Cir.2000) (internal quotation and citation omitted).

Thus, in the instant case, if Isaiah knew of the prior search, his consent may be considered tainted, and evidence found must be suppressed if Isaiah's consent was a product of the initial illegal search. If, however, Isaiah, who was in hiding during the time of the initial search, was oblivious to the fact of an earlier search at the time he gave his consent to the second search, then the consent cannot be considered tainted.

Although there is some evidence in the record circumstantially suggesting that Isaiah was not in view of the residence for at least some period of his hiding, the district court made no finding of fact regarding whether Isaiah did or didn't know of the first search. There was no evidence presented at the evidentiary hearing regarding where exactly Isaiah was hiding in relation to the location of the cabin and whether he could see the cabin from that

vantage point, or whether he spoke to any of the other juveniles upon his return to the cabin who might have told him that the officers had been inside. The district court did not need to address the question of Isaiah's knowledge of the activity at the cabin prior to his return because the court found the initial entry to be legal. We therefore have insufficient evidence upon which to determine whether Isaiah's consent was tainted, and must remand to the district court for further findings on whether, at the time he gave his consent to the search, Isaiah was cognizant of the prior illegal entry. If the district court finds that Isaiah had knowledge of the first search, then his consent may have been tainted, and the motion to suppress should have been granted if the illegal search was a product of Isaiah's consent. Stated another way, if Isaiah knew of the illegal search, then the district court must decide whether the illegal search was sufficiently attenuated from the subsequent consent search to render the consent search untainted. *See Wong Sun,* 371 U.S. at 486, 83 S.Ct. 407; *Taheri,* 648 F.2d at 601. If, however, the district court finds that Isaiah knew nothing of the first search or had knowledge that did not affect his consent, then the motion was properly denied.

### C.

The final issue before this Court is the validity and scope of the search warrant and the search conducted pursuant to that warrant.

### 1.

▆ Furrow's first argument is that the district court erred in denying him a *Franks* hearing on the veracity of the information underlying the warrant. *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). We review the district court's refusal to conduct such a hearing de novo. *United States v. Meling,* 47 F.3d 1546, 1553 (9th Cir.1995).

▆ Where a defendant makes a substantial preliminary showing that a false statement was (1) deliberately or recklessly included in an affidavit submitted in support of a search warrant; and (2) material to the magistrate's finding of probable cause, the court must hold a hearing to investigate the truthfulness of the affiant. *United States v. Fisher,* 137 F.3d 1158, 1164 (9th Cir.1998); *Meling,* 47 F.3d at 1553. The Court in *Franks* made clear the strict requirement of proof:

> There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

438 U.S. at 171, 98 S.Ct. 2674.

In this case, the appellant filed no affidavits or other offers of proof supporting his allegation of intentional falsity. Appellant also failed to explain this failure to make a substantial showing, except to say that "filing an affidavit may simply relegate this matter to a war of affidavits." Furrow urged the district court to find that counsel's representation that he would present evidence of reckless disregard for truth at the *Franks* hearing was enough to warrant the hearing. The district court disagreed and correctly held that the failure to make a substantial showing precluded holding a *Franks* hearing. The decision of the district court is upheld.

### 2.

▆ Furrow next argues that the warrant was not supported by probable cause. A magistrate judge's finding of probable cause is reviewed for clear error. *United States v. Henson,* 123 F.3d 1226, 1238 (9th Cir.1997), overruled on other

grounds by *United States v. Foster*, 165 F.3d 689 (9th Cir.1999).

The search warrant in this case was supported by the evidence found in the consent search, and the testimony of Officer Northrup regarding his independent knowledge of the High Times magazine article and the neighbor's suicide. If the district court finds that Isaiah knew of the initial search, the subsequent consent search is invalid, and the evidence seized in that search could not be used to support the warrant. If the evidence discovered in the consent search is thrown out, probable cause for the issuance of the warrant is lacking. The district court specifically found that the other information provided in the affidavit from Furrow's ex-wife and the information about a young man who obtained drugs and committed suicide would not, standing alone, have been enough to support a probable cause determination.

■■■■ If, however, the initial warrantless search is upheld following new findings by the district court, then the district court correctly found that probable cause existed for the issuance of the warrant. A judge is to consider the totality of the circumstances set forth in the affidavit before him, and then is "simply to make a practical, common-sense decision whether, given all the circumstances ... including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

The testimony of the prosecuting attorney before the Magistrate indicated that Isaiah had already admitted that there had been marijuana smoking at the party. Officers had observed underage drinking, and the evidence of such drinking. Additionally, Northrup had found considerable evidence of marijuana use in the second warrantless search. All of this provided ample probable cause for the warrant.

The additional hearsay information regarding a possible marijuana grow or distribution operation further supported the warrant, but was not necessary for the finding of probable cause. The finding of the magistrate judge that probable cause existed for the search was not clearly erroneous.

3.

■■■■ Finally, we address the question of whether the four outbuildings were properly within the scope of the warrant. Whether an area is within the protected curtilage of a home is an essentially factual inquiry reviewed for clear error. *United States v. Soliz*, 129 F.3d 499, 502 (9th Cir.1997).

■■■■ The question of curtilage in this case is not the typical one. The question of whether an area constitutes curtilage usually arises where officers have a warrant generally authorizing search of a residence, and the court has to determine whether an area beyond the home was properly searched under the warrant because it fell within the residence's curtilage. The search of the curtilage of a residence is authorized when a warrant authorizes search of a residence. *United States v. Gorman*, 104 F.3d 272, 275 (9th Cir.1996). In this case, however, the warrant itself specified that it was for the residence and "four outbuildings." There is no evidence that the officers had any independent probable cause for a search of the outbuildings. Thus, the question is whether the magistrate properly assumed that the outbuildings were curtilage and therefore rightly included in a warrant where probable cause supported a search of the residence. If the outbuildings were not within the curtilage of the residence, then the mere fact of their inclusion in the scope of the warrant is immaterial.

■■■■ The extent of the curtilage is determined by whether the individual may reasonably expect that the area in question

should be treated as the home itself. *United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). The central component of this inquiry is "whether the area harbors the intimate activity associated with the sanctity of a man's home and privacies of life." *Id.* (citation and quotation omitted). The Supreme Court has outlined four factors that a court should consider in determining whether an area is curtilage: (1) the proximity of the area to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses of the area, and (4) the steps taken by the resident to protect the area from observation by passersby. *Dunn*, 480 U.S. at 301, 107 S.Ct. 1134. The inquiry is a factual one. This court has held that an outbuilding 45 feet from a residence was not within the curtilage, and that an outlying shop building 70 to 75 feet from a residence was curtilage. *United States v. Brady*, 993 F.2d 177 (9th Cir. 1993); *United States v. Traynor*, 990 F.2d 1153 (9th Cir.1993). The district court's determination must only be plausible, given the record, for it not to be clearly erroneous. *Brady*, 993 F.2d at 179.

Whether Furrow's shop building was within the curtilage is best stated by the district court in its findings at the hearing on the motion to suppress when it stated:

> The search warrant obviously provided that it was for a search for possession of marijuana and that the premises to be searched were the residence and the four outbuildings, which brings us to this curtilage issue. Obviously, we know that this was a rural area, that the rural nature of the premises in my judgment supports a finding that the shop, even if a hundred feet away, is still within the curtilage where the shop and the garage was [sic] used for domestic purposes and the conduct of family affairs. The nature of what was stored in the shop supports its use for domestic purposes. The tools were used in the Defendant's trade. The four-wheeler, the motorcy-

cles, things of similar nature, were used for recreation by family members.

> The driveway, Exhibit No. 6, showed that as you approached the premises it opens up to all five buildings, the residence and the four outbuildings. There was no fence or other obstruction between the house and the shop.

> The timbered area actually in fact sufficed to enclose the house and the four outbuildings as one curtilage. As with most outbuildings, whether they be within 25 feet or 100 feet of a residence where the building is used to store valuable assets, the fact that it is locked it really not that significant. So the Court finds that it was objectively reasonable for law enforcement officers to believe the curtilage search was authorized, particularly when the warrant itself authorized the same.

Under the stringent standard of review governing this inquiry, we must conclude that the record plausibly supports the district court's conclusion that the outbuilding was within the curtilage. We find that the decision of the district court was not clearly erroneous.

## III.

We are unable to settle the important Fourth Amendment questions raised here absent further fact finding by the district court. Accordingly, the decision of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.