**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Patrick Flores OAXACA, Defendant–
Appellant.**

**No. 99–30062.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 11, 2000

Filed Nov. 15, 2000

Vance M. Waliser, Medford, Oregon, for the defendant-appellant.

Robert G. Thomson, Assistant United States Attorney, United States Attorney's Office, Medford, Oregon, for the plaintiff-appellee.

Before: FERGUSON, GRABER, and W. FLETCHER, Circuit Judges.

FERGUSON, Circuit Judge:

Patrick Flores Oaxaca ("Oaxaca") appeals his conviction and sentence for conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), and 846. We conclude that the district court committed reversible error when it denied his motion to suppress evidence that government agents found after arresting him in his home without a warrant.[1]

## FACTUAL BACKGROUND

This case arose from the Drug Enforcement Agency's ("DEA") undercover investigation, beginning in March of 1997, into the distribution of methamphetamine in Klamath Falls, Oregon. Initially, the agents suspected that a man named Frankie Fregoso ("Fregoso") was the leader of a conspiracy to distribute the drug.

---

1. Because we reverse Oaxaca's conviction, we do not address the other challenges he raises on appeal.

In an attempt to confirm their suspicion, they bought methamphetamine from him several times. During some of these encounters, Fregoso mentioned that his sources lived in Medford, Oregon, and in Los Angeles, California, but he did not offer any names. On June 4, 1997, the agents arrested Fregoso and various people who had accompanied him during the sales to the government with the hope that they would identify their source.

The DEA agents turned their attention to Oaxaca only after Randy Newman ("Newman"), one of the people they had arrested on June 4, 1997, pointed a finger at him as the conspiracy's supplier. The day after his arrest, Newman dialed Oaxaca's phone number and offered to buy one pound of methamphetamine and arranged to pick it up in Fresno. On June 6, 1997, William Valenzuela, Jr. ("Valenzuela"), Oaxaca's co-defendant, delivered methamphetamine to Newman and accompanying undercover agents in a McDonald's parking lot. After arresting Valenzuela, the agents proceeded to Oaxaca's house to arrest him as well.

When the agents drove to Oaxaca's house to arrest him, they did not have an arrest warrant. As soon as they arrived, they saw Oaxaca standing inside his attached garage. The agents walked through the door, into the garage, and placed him under arrest. They then walked into other parts of the house hoping to find a family member who would consent to a search of Oaxaca's bedroom.

Ten minutes after arresting Oaxaca inside of his garage, the agents persuaded his sister, Nancy Oaxaca ("Nancy"), to consent to a search. During the suppression hearing, Nancy testified that she saw the agents driving up to the family's house and immediately ran to the garage. When she got there, she saw her brother on his knees on the floor and three or four armed agents wearing vests that identified them as DEA agents. She testified that, "I thought it was a raid. I thought it was—I was freaking out. I didn't know what was

going on." The agents confronted her with a backpack filled with marijuana that they had found in the garage. Seeing the marijuana gave Nancy "a bad feeling" and made her scared. She also felt pressured to sign the consent form when the agents told her that if she did not sign, they would secure the residence while they applied for a search warrant.

The agents found several incriminating items during their search. They seized numerous cellular phones, a pager that displayed a number in Klamath Falls, several plastic bags containing methamphetamine residue, Fregoso's phone number scrawled on an envelope, a traffic citation from Oregon, and Valenzuela's personal papers, all of which appeared to confirm Newman's story that Oaxaca was not only a drug dealer, but also the supplier of the conspiracy to distribute methamphetamine in Klamath Falls.

Oaxaca was indicted for one count of conspiracy to distribute methamphetamine. See 21 U.S.C. § 841(a)(1). Before trial, he moved to suppress the evidence from his home, arguing that his arrest violated the Fourth Amendment's warrant requirement and tainted Nancy's subsequent consent to search. The district court denied his motion to suppress, holding that because Oaxaca was exposed to public view while standing inside his garage, the agents were not required to obtain an arrest warrant and Nancy's consent was voluntary.

## DISCUSSION

### A.

■ Oaxaca acknowledges that probable cause existed to arrest him, but he contends that the evidence the Government found in his home was the fruit of an illegal arrest and that the district court erred in denying his motion to suppress it. The Supreme Court and our court have made crystal clear that, in the absence of exigent circumstances, the police must ob-

tain an arrest warrant before entering a person's home to arrest him. *See Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). As Judge Fernandez emphasized in *United States v. Albrektsen*, 151 F.3d 951, 953 (9th Cir. 1998) (citation omitted):

> Nowhere is the protective force of the fourth amendment more powerful than it is when the sanctity of the home is involved. The sanctity of a person's home, perhaps our last real retreat in this technological age, lies at the very core of the rights which animate the amendment. Therefore, we have been adamant in our demand that absent exigent circumstances a warrant will be required before a person's home is invaded by the authorities.

The Government does not claim that there were exigent circumstances that justified the warrantless entry into Oaxaca's garage.

█ In the face of clearly contrary law, the Government asserts that the agents were *not* required to obtain an arrest warrant because Oaxaca's attached garage is not part of his home. The Supreme Court has long extended the Fourth Amendment's protection to garages. *See Taylor v. United States*, 286 U.S. 1, 6, 52 S.Ct. 466, 76 L.Ed. 951 (1932) (holding that search of garage without a warrant violated the Fourth Amendment). Moreover, we have rejected the argument that the Government makes here, writing that "[n]o reason exists to distinguish an attached garage from the rest of the residence for Fourth Amendment purposes." *United States v. Frazin*, 780 F.2d 1461, 1467 (9th Cir.1986); *see also Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 884–85 (9th Cir.1990); *United States v. Suarez*, 902 F.2d 1466, 1468 (9th Cir.1990). We can conceive of no reason to distinguish a garage, where people spend time, work, and store their possessions, from a den or a kitchen, where people spend time, work, and store their possessions. Simply put, a person's garage is as much a part of his castle as the rest of his home.

█ The Government alternatively argues that the agents did not need a warrant because Oaxaca had left his door open, which exposed him to people outside. When pressed during oral argument on this point, the Government went so far as to suggest that a person who desires the protection of the Fourth Amendment must keep his doors and windows shut. The Fourth Amendment does not, however, protect only hermetically sealed residences.

Indeed, the argument that anyone who is visible from the street implicitly invites the Government to enter his home not only deeply offends common sense, but flies in the face of well-established law. In *Payton*, 445 U.S. at 590, 100 S.Ct. 1371, the Supreme Court invalidated an arrest that was virtually indistinguishable from the one in this case. There, as here, the police saw the suspect through an open door, crossed its threshold, walked inside the room, and arrested him. *Id.* at 578, 100 S.Ct. 1371. In holding that the arrest was unconstitutional, the Court emphasized, "the Fourth Amendment has drawn a firm line at the entrance of the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590, 100 S.Ct. 1371.

The Supreme Court applied the same principle in *New York v. Harris*, 495 U.S. 14, 17, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), deeming it "evident" that police officers had violated the *Payton* rule by arresting Harris only after knocking on his door, showing him their badges, and following him inside his home. The Court reasoned, "Payton ... drew a line at the entrance to the home. This special solicitude was necessary because physical entry of the home is the chief evil against which the working of the Fourth Amendment is directed." *Id.* at 18, 110 S.Ct. 1640 (internal quotation marks omitted); *see also LaLonde v. County of Riverside*, 204 F.3d 947, 955 (9th Cir.2000) (holding that the

Fourth Amendment was violated because "[t]he arrest took place only after the officers had crossed the threshold of the door and entered LaLonde's apartment"). Because the officers in this case crossed the threshold of the door and entered Oaxaca's home before placing him under arrest without a warrant, they violated the Fourth Amendment.

In urging us to uphold Oaxaca's arrest, the Government relies on *United States v. Vaneaton*, 49 F.3d 1423 (9th Cir.1995), but its reliance is misplaced. In that case, we followed the Supreme Court's decision in *United States v. Santana*, 427 U.S. 38, 42, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), permitting arrests at the doorway. More specifically, we upheld Vaneaton's warrantless arrest because the officers arrested him "while standing outside his motel room." *Id.* at 1425–26. The Government in this case does not claim that the DEA agents, like the officers in *Vaneaton*, remained outside of Oaxaca's home to arrest him. On the contrary, it acknowledges in its brief that "Defendant Oaxaca was . . . arrested while standing in an open garage." Thus, the doorway exception to the warrant requirement simply does not apply.

**B.**

▇▇▇ Having concluded that the entry into Oaxaca's garage violated the Fourth Amendment, we turn now to the question of whether Oaxaca's illegal arrest tainted Nancy's consent to search his bedroom. Although the district court concluded that her consent was voluntary, "[t]he mere fact of voluntariness does not mean that a consent is not tainted by a prior Fourth Amendment violation." *United States v. Furrow*, 229 F.3d 805, 2000 WL 1509977, at * 6 (9th Cir. Oct.12, 2000).

▇▇▇ Consent by a defendant or a third party is tainted where the evidence indicates that it stemmed from the prior illegal Government action. *Id.* 229 F.3d 805, at * 7; *see also United States v. Howard*, 828 F.2d 552, 556 (9th Cir.1987). For example, where the person who offers the consent "knew of the prior [illegal action], his consent may be considered tainted, and evidence found must be suppressed. . . ." *Furrow*, 229 F.3d 805, 2000 WL 1509977, at * 7.

▇▇▇ There can be no doubt that Nancy's consent to search was the fruit of the Government's warrantless entry and arrest. She gave her consent mere moments after running to the garage, where she saw several armed DEA agents and her brother on his knees, already under arrest. As she put it during the suppression hearing, she was "freaking out" because she thought that it was a "raid." Moreover, where, as here, the police confront a person with contraband that they have illegally found, the subsequent consent to search is fruit of the Government action. *Taheri*, 648 F.2d at 601; *United States v. Thomas*, 955 F.2d at 211. Because the consent in this case flowed from the Government's illegal action, it is invalid.

**C.**

▇▇▇ The trial court's error in admitting the evidence requires the reversal of Oaxaca's conviction. Determining the harmlessness of an error is distinct from evaluating whether there is substantial evidence to support a verdict. As we have explained:

> There is a striking difference between appellate review to determine whether an error affected a judgment and the usual appellate review to determine whether there is substantial evidence to support a judgment. Review for harmless error requires the most painstaking examination of the record and the most perceptive reflections as to the probabilities of the effect of error on a reasonable trier of fact.

*Standen v. Whitley*, 994 F.2d 1417, 1423 (9th Cir.1993) (internal quotation marks omitted). By its own admission to jurors at trial, the Government's case suffered from the weakness of relying principally

on a longtime criminal and drug dealer whose cooperation with the government reduced a potential life sentence in a federal prison to fifty-seven months with the possibility of an early release. That criminal was Newman, whom three other witnesses consistently characterized as a liar who would do or say anything to avoid going back to prison. Moreover, Newman's testimony that Oaxaca, a Fresno resident, was the conspiracy's supplier contradicted Fregoso's comment to undercover agents that his sources were in Los Angeles and Medford. Other than Newman, the only evidence tying Oaxaca to Fregoso, Klamath Falls, and to the drug trade in general came straight from his bedroom. To prove that Oaxaca was the conspiracy's supplier, the Government repeatedly brought up its illegal find, pointing to it in its opening and closing arguments, confronting and discrediting defense witnesses with it, and eliciting testimony about the high probability that a person who possessed such items would be a dealer. In light of the record, we conclude that the error in admitting the illegally seized evidence at trial was not harmless beyond a reasonable doubt. We therefore reverse Oaxaca's conviction.

REVERSED.

GRABER, Circuit Judge, dissenting:

I respectfully dissent.

First, I have doubts about the breadth of the majority's holding concerning the treatment of this open garage door under the Fourth Amendment. For example, the majority relies on *Taylor v. United States*, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932), and on *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Maj. op. at 1157–59. Those cases are distinguishable in an essential respect: In those cases, the police, not the occupants of the premises, caused the doors to be opened. In *Taylor* the officers obtained entry to a locked, attached garage by forcing the lock. 286 U.S. at 5, 52 S.Ct. 466. In *Payton* the officers obtained

entry to a house by knocking and causing the door to be opened. 445 U.S. at 578, 100 S.Ct. 1371; *see also New York v. Harris*, 495 U.S. 14, 15, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) (police knocked on the door, causing it to be opened, and followed the defendant inside his home).

By contrast, here, Oaxaca had willingly left the garage door wide open. The garage is small, while its door is huge; and the garage faces the street at close range, so opening it exposed most of the interior to ready public view. These facts make this case closer to *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), which permitted an arrest to take place inside a home when the arrestee first was seen standing in the open doorway of the home. And, if the arrest of Oaxaca was lawful, then the majority's reason for refusing to give effect to his sister's consent to search, maj. op. at 1158, evaporates.

Second, and even leaving aside those doubts, any error in denying the motion to suppress evidence found in Oaxaca's room was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (establishing standard for harmless error). The items seized were not a "smoking gun" and, indeed, were trivial when compared with the other evidence of his guilt. For example, Newman testified that Oaxaca was his source for methamphetamine; that Oaxaca freely discussed his drug dealings in Newman's presence (for instance, amounts and quality of drugs); that he saw Oaxaca in possession of methamphetamine; that Newman, Fregoso, and Oaxaca met to discuss the prices of various drugs and made a deal for the sale of cocaine and methamphetamine; that Oaxaca delivered those drugs; and that Newman was the middleman for several sales from Oaxaca to Fregoso of methamphetamine. The majority makes much of the testimonial assaults on Newman's credibility, maj. op. at 1158–59, but his testimony

was corroborated in many important respects by undercover agents. For example, they taped a call in which Oaxaca agreed to sell one pound of methamphetamine to Newman, a portion of which in fact was delivered, and they corroborated the dates of some of the sales about which Newman testified. In view of that extensive, corroborated evidence—including Oaxaca's own taped agreement to sell a pound of methamphetamine, some of which then was delivered—the admission of the evidence seized from Oaxaca's room cannot have played a significant role in the jury's decision to convict him.

For the foregoing reasons, I do not believe that the government is required to retry Oaxaca without using the evidence found in his room. I would affirm the conviction and, accordingly, dissent from the majority's contrary holding.