Filed 6/17/26  P. v. Seto CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RICHARD SETO,<br><br>        Defendant and Appellant. | A173342<br><br>(San Mateo County<br> Super. Ct. No. 24NF005508-A) |

Richard Seto appeals from a conviction of possession of child or youth pornography with a prior conviction.  He contends the trial court erred in denying his motion to suppress evidence.  We affirm.

## BACKGROUND

Seto was convicted in 2021 of possession of child pornography (Pen. Code,[1] § 311.11, subd. (a)), as a result of which he is required to register as a sex offender.  (§ 290, subd. (c)(1).)  At 10:00 a.m. on October 26, 2023, five Daly City police officers conducting an annual "290 compliance sweep" went to the address Seto had given when he registered.  Officer Rodney Chittenden explained that a compliance sweep is a check to make sure registered offenders in the city are at the residence indicated on their registration.

---

[1]  Further statutory references will be to the Penal Code.

1

Chittenden testified that the officers identified themselves to Seto and told him they were there to conduct a compliance check.  One of the officers asked Seto if he would mind coming outside, and when Seto did so, an officer immediately asked him, "All right.  What's here?  No weapons or anything like that?"  The officer conducted a pat-down search while holding Seto's arm behind him, which Chittenden testified was the typical procedure they were trained to use to ensure the person does not reach into a pocket or waistband during the pat down.

One of the officers told Seto they were going to "make sure that everything is accurate" and asked, "Do you mind if I take a look around."  Seto told them, "Sure, go ahead."  The officer said, "All right.  Why don't you step out and talk to my partner real quick."  The officer indicated for Seto to walk down the staircase from the front door.  Chittenden and two other officers entered the house; the other two officers stayed outside.  The door to the residence was open and Chittenden could hear portions of the conversation between Seto and Detective McCarthy, who was asking Seto questions.

About 10 minutes into the search, Chittenden heard Seto say he had recently viewed child pornography on a device.  This directed Chittenden's attention to the need to preserve the electronic evidence.  Seto told Chittenden where his laptop was and Chittenden seized it to ensure evidence was not concealed or destroyed.  Seto gave him the password and did not say he did not want the police to search the laptop.  Nor did he ever tell Chittenden he no longer wanted the police searching his house.  Chittenden testified that Seto was "very cooperative throughout the entire contact."  While still at the house, another officer performed a cursory check of the computer for open browser windows or "obvious" child sex abuse material but

2

did not find any.  The police later obtained a search warrant for a more thorough search of the laptop.[2]

Sergeant McCarthy[3] testified that as he spoke with Seto outside, their tone was conversational.  Seto was standing part of the time, then seated; he was not handcuffed and McCarthy did not pull his weapon.  McCarthy testified that he asked Seto what his sex offender registration status was for and Seto initially seemed hesitant or embarrassed, then said it was for possession of child pornography.  McCarthy asked if there was "anything in the house right now that's going to have that" and Seto said no.  McCarthy asked, "So if I take your computer and go run through our system right now, I'm not going to find any child porn on there?"  Seto said no.  McCarthy said, "That didn't sound very confident.  Is there child porn on your phone?"  Seto said no.  McCarthy asked if there was any on his computer and Seto said no, then McCarthy asked, "For sure?"  Seto said, "Not on my computer.  Not on my phone."  McCarthy asked, "Where would it be? . . . Do you have a flash drive somewhere?  Hard drive?"  Seto said no.  McCarthy again said, "That doesn't seem very confident to me," and Seto said, "Not on me."  About 10 minutes into the conversation, Seto told McCarthy he had recently viewed underage girls online.  When Seto was asked for his computer password, he gave it without hesitation.  He never said he wanted the police to stop searching his house or did not want them to search digital devices in the house.

---

[2] According to the probation report, forensic analysis of Seto's electronics identified over 5,300 images containing "Child Sexual Abuse Material," with victims' ages ranging from approximately 4 to 14 years old.

[3] By the time of the suppression hearing, McCarthy had been promoted to sergeant.

Seto was charged by information filed on May 6, 2024, with one count of possession of child pornography with a prior violation. (§ 311.11, subd. (b).) The information alleged as an aggravating circumstance that the crime involved a large quantity of contraband. (§ 1170, subd. (b).) Seto filed a motion to suppress evidence (§ 1538.5), which the trial court denied after a hearing. He subsequently pleaded no contest and the aggravating circumstance allegation was stricken. On April 30, 2025, he was sentenced to the middle term of four years in prison.

Seto filed a timely notice of appeal on May 5, 2025.

## DISCUSSION

Seto sought suppression of his statements to the police and the child pornography found on his computer. In denying the motion, the trial court found the pat-down was a permissible limited search for weapons; Seto consented to the search of his home by telling the officers to "go ahead" when they asked if he would mind them looking around; and the circumstances were not "unduly coercive" as Seto was not handcuffed, no weapons were drawn, and the tone of the discussion was conversational. The court found Seto was not subjected to an unduly long detention because only 10 minutes passed before he admitted recently viewing child pornography, which informed the police of the possible presence of child sex abuse material and permitted them to search for it. Finally, the court found the cursory search of the laptop at Seto's residence was lawful because Seto's "demeanor and his permission by giving his password" suggested "this was all a voluntary, consensual encounter"; the seizure of the electronics was justified by exigency since his devices might contain the material he admitted viewing; and the officers obtained a warrant to conduct the more thorough search that in fact revealed the evidence against him.

4

" ' "In reviewing a trial court's ruling on a motion to suppress evidence, we defer to that court's factual findings, express or implied, if they are supported by substantial evidence.  [Citation.]  We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment." ' (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 232.)  In doing so we do not consider each fact in isolation.  Instead, 'we must consider "the totality of the circumstances—the whole picture." ' (*United States v. Sokolow* (1989) 490 U.S. 1, 8 (*Sokolow*), quoting *United States v. Cortez* (1981) 449 U.S. 411, 417 (*Cortez*).)"  (*People v. Flores* (2024) 15 Cal.5th 1032, 1043.)

Seto's challenge to the trial court's ruling is founded on his claim that the pat-down search was unlawful because the officers had no reason to suspect he was armed and dangerous.  This illegality, he maintains, tainted the rest of the encounter:  His consent to the search of his home was not voluntary because it was tainted by the preceding unlawful pat search; since the search was unlawful, his detention during it was also unlawful; his admission was a product of the constitutional violations that preceded it; and therefore the search of his laptop was unlawful.  The People concede the pat-down search was unlawful but argue the admission that led to discovery of the child pornography on Seto's laptop was not "fruit of the poisonous tree."

The People's concession that the pat search was unlawful is appropriate.  A police officer may conduct a reasonable search for weapons where the officer "has reason to believe that he is dealing with an armed and dangerous individual." (*Terry v. Ohio* (1968) 392 U.S. 1, 27.)  But for the search to be justifiable, there must be "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (*Id.* at p. 21.)  Neither "inarticulate hunches" nor " 'good

5

faith on the part of the arresting officer' " is sufficient. (*Id.* at p. 22.) The People concede there were no facts here to justify the pat search.

As the People point out, however, the pat search did not yield any incriminating evidence. The question is whether the unlawful pat search nevertheless requires suppression of the evidence through the sequence of events following Seto's consent to the search of his residence.

"The voluntariness of consent is a question of fact to be determined from the totality of circumstances. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 227 *(Schneckloth); [People v.] Jenkins* [(2000)] 22 Cal.4th 900, 973.) If the validity of a consent is challenged, the prosecution must prove it was freely and voluntarily given—i.e., 'that it was [not] coerced by threats or force, or granted only in submission to a claim of lawful authority.' (*Schneckloth, supra,* at p. 233; see *[Florida v.] Royer* [(1983)] 460 U.S. 491, 497.)" (*People v. Boyer* (2006) 38 Cal.4th 412, 445-446 (*Boyer*).) On its face, Seto's consent was voluntary: An officer asked if Seto would "mind" him taking "a look around" and Seto responded, "Sure, go ahead." Seto does not argue otherwise, but he argues that even if the consent was voluntary "in the exact moment he gave it," it was in fact tainted by the prior constitutional violation.

"The mere fact of voluntariness does not mean that a consent is not tainted by a prior Fourth Amendment violation." (*United States v. Furrow* (9th Cir. 2000) 229 F.3d 805, 813.) To determine whether evidence is subject to exclusion as the fruit of a prior constitutional violation, the "main consideration" is "whether the consent given is 'sufficiently an act of free will to purge the primary taint of the unlawful invasion.' " (*Ibid.*) "A suspect's knowledge of a prior illegal search can give rise to a sense that refusing to consent would be futile." (*United States v. Washington* (9th Cir. 2004)

6

387 F.3d 1060, 1074.) "Consent that is the product of an illegal detention is not voluntary and is ineffective to justify a search or seizure. [Citations.] Where an illegal detention occurs, unless 'subsequent events adequately dispel the coercive taint of the initial illegality, i.e., where there is no longer causality, the subsequent consent is' ineffective." (*People v. Zamudio* (2008) 43 Cal.4th 327, 341.)

"[E]vidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence. Suppression is not justified unless 'the challenged evidence is in some sense the product of illegal governmental activity.' " (*Segura v. United States* (1984) 468 U.S. 796, 815, quoting *United States v. Crews* (1980) 445 U.S. 463, 471.) Moreover, suppression of evidence as " 'fruit of the poisonous tree' " is not always required "*even if* the evidence would not have come to light *but for* an infringement of the defendant's Fourth Amendment rights." (*Boyer, supra,* 38 Cal.4th at p. 448.) "Rejecting a strict 'but for' test, the United States Supreme Court has admonished that in such cases, 'the more apt question . . . is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." [Citation.]' [Citation.] . . . The question is whether the evidence was obtained by the government's exploitation of the illegality or whether the illegality has become attenuated so as to dissipate the taint.' " (*Boyer*, at p. 448.)

"Relevant factors in this 'attenuation' analysis include the temporal proximity of the Fourth Amendment violation to the procurement of the challenged evidence, the presence of intervening circumstances, and the flagrancy of the official misconduct. (*Brown v. Illinois* (1975) 422 U.S. 590,

603-604 (*Brown*).)" (*Boyer, supra,* 38 Cal.4th at p. 448.) "The third *Brown* factor, the flagrancy and purposefulness of the police misconduct, is generally regarded as the most important because 'it is directly tied to the purpose of the exclusionary rule—deterring police misconduct.' " (*People v. Brendlin* (2008) 45 Cal.4th 262, 271.)

The first two factors, as the People concede, do not support finding attenuation: Seto's consent to search the residence immediately followed the pat search, with no temporal separation and no intervening circumstance. The third factor, however, points in the opposite direction.

The pat search, as we have said, was unlawful because there were no facts providing the officers with reason to suspect Seto was armed and dangerous. Rather, the officers and trial court appear to have erroneously assumed the fact that Seto was coming outside to talk justified a precautionary search for weapons—an assumption that may be understandable with respect to generalized concern for officer safety but cannot be squared with *Terry*. (See *People v. Dickey* (1994) 21 Cal.App.4th 952, 956 ["In every encounter with a citizen by the police, the citizen may potentially be armed"].) Officer safety is a critical concern, but "the *Terry* rule . . . is well known to the police." (*Id.* at p. 957.)

Still, the circumstances surrounding the pat search do not reflect flagrant misconduct. The officers had a reason for contacting Seto and informed him why they were at his home; he came outside when they asked if he "would mind" doing so; they made clear that the ensuing pat search was to ensure he did not have a weapon; and the search did not exceed the parameters of a pat search for weapons. There is no reason to believe the pat search was pretextual, as the officers were not investigating an offense for which they could expect to discover evidence in a pat search. There is no

8

indication the search was invasive or conducted in a manner that was forceful or reflected intimidation or harassment or was otherwise coercive. (See *Brown, supra,* 422 U.S. at p. 605 [illegal arrest had "quality of purposefulness" and "appearance of having been calculated to cause surprise, fright, and confusion"].) The evidence supports the trial court's finding that this was "a simple pat-down" for officer safety. As the police were there to investigate Seto's compliance with a registration requirement stemming from his prior criminal conviction, the pat search may not have seemed particularly surprising to Seto. None of this excuses the officers' conduct. But it does suggest the violation of Seto's rights was not flagrant or coercive.

Seto urges the pat search was part of a set of circumstances—including the number of officers present, the pat down, the request to search the residence, and the detention—that demonstrate the officers' objective was to conduct a warrantless search of his home. He likens the officers' conduct to that of the officer in *People v. McWilliams* (2023) 14 Cal.5th 429 (*McWilliams*). There, an officer responding to a report of suspicious activity detained a bystander with no apparent connection to the report, then learned from a records check that the bystander was subject to a parole search condition, searched him and his vehicle, and discovered a firearm and drugs. (*Id.* at p. 435.) The detention was undisputedly illegal, and *McWilliams* held the discovery of the parole search condition did not sufficiently attenuate the constitutional violation because the condition merely gave the officer discretion to search.[4] (*Id.* at pp. 435, 440, 442.)

---

[4] *McWilliams* distinguished cases allowing admission of evidence seized incident to arrest on a valid warrant discovered during an unlawful investigatory stop. (*McWilliams, supra,* 14 Cal.5th at pp. 434-435.) Unlike those cases, in which the arrest warrant *required* the officer to arrest the defendant, the discretionary authority to search afforded by the parole

Seto relies on *McWilliams* as an illustration of police improperly creating circumstances to justify a search. But the case does not help determine whether the unlawful pat search in the present case negated the voluntariness of Seto's consent. Unlike the present case, the issue in *McWilliams* did not require the court to consider the effect of the constitutional violation on the defendant; the issue there was whether an independent event provided a basis for the search despite the violation. Further, the violation in that case was considerably more egregious than the pat search to which Seto was subjected. The officer in *McWilliams* had no justification for even contacting the defendant: The officer was investigating a report of two suspicious individuals on bicycles shining flashlights into cars in a business parking lot, and found the defendant fully reclined in the passenger seat of car parked in an adjacent lot, with no bicycle or flashlight in sight. (*McWilliams, supra,* 14 Cal.5th at pp. 442, 447.) Here, the officers went to Seto's home for the purpose of conducting a section 290 compliance check, he responded to their knock at the door and came outside to talk with them at their request.

The presence of multiple officers no doubt suggests the police came prepared to search the premises; the record reflects no other explanation for so many officers to be involved in a compliance check. But it does not necessarily follow that the circumstances were sufficiently coercive to undermine the voluntariness of Seto's consent. *People v. James* (1977) 19 Cal.3d 99, for example, upheld the trial court's implied finding that the defendant's consent to search his home was voluntary even though he

---

condition did not sufficiently attenuate the connection to the illegal detention. (*Id.* at p. 435.)

10

consented after four police officers investigating a robbery appeared at his door, asked him to step outside, then arrested and handcuffed him. (*Id.* at pp. 106-107.) *James* noted that "the arresting officer neither held defendant at gunpoint, nor unduly detained or interrogated him; the officer did not claim the right to search without permission, nor act as if he intended to enter regardless of defendant's answer." (*Id.* at p. 113.) The same is true here. Further, the defendant in *James* was handcuffed and under arrest. (*Id.* at p. 107.) This made the circumstances in James considerably more coercive than those here.

In arguing that the discovery of the incriminating evidence on his laptop was the product of the illegal pat search and subsequent consent to search his home, Seto maintains that he admitted having recently viewed child pornography only when he "cave[d]" to 10 minutes of "relentless questioning" while his home was being searched. But while McCarthy's testimony makes clear that he pressed Seto as to whether he possessed child pornography, nothing in the transcript of the hearing compels a conclusion that the questioning was "relentless," and Seto's description cannot be squared with the trial court's finding that the officers' tone was conversational and the situation was not unduly coercive. The officers' testimony, which included references to the transcript of recorded footage from the officer's body worn camera, supports the trial court's conclusion. The trial court heard the testimony and was able to evaluate the credibility of the officers' description of the conversation and the circumstances as a whole. We have no basis to override that credibility determination.[5]

---

[5] Excerpts of the recorded footage and the transcript of the recording were used at the hearing to refresh the officers' recollection. Neither the recording nor the transcript was introduced into evidence at the hearing and they are not part of our record on appeal.

As we have said, Seto's argument on appeal is founded on the pat search, which he presents as the constitutional violation that tainted his consent to the search of his home and ensuing sequence of events culminating in his admission.  He does not suggest any reason for finding his admission or the search and seizure of his laptop invalid if his consent to the search of his home was voluntary.  We conclude the motion to suppress was properly denied.

## DISPOSITION

The judgment is affirmed.

                              STEWART, P. J.


We concur.


MILLER, J.


DESAUTELS, J.


*People v. Seto* (A173342)