**UNITED STATES of America,**
**Plaintiff—Appellee,**

v.

**Eulalie Natalie WHITEHORN,**
**Defendant—Appellant.**

**No. 04–30060.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 1, 2004.

Decided Jan. 10, 2005.

Lori Harper Suek, Esq., Office of the U.S. Attorney, Great Falls, MT, for Plaintiff–Appellee.

Jason T. Holden, Great Falls, MT, for Defendant–Appellant.

Before: ALARCÓN, W. FLETCHER, and RAWLINSON, Circuit Judges.

### MEMORANDUM *

Eulalie Whitehorn appeals her conviction, following a bench trial, for knowingly possessing 50 grams or more of methamphetamine, with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Whitehorn argues that the district court erred in denying her motion to suppress evidence seized from a search of her motel room because (1) the police officers exceeded the scope of her initial consent; and (2) her subsequent written consent to a continuation of the search was not voluntary.[1]

---

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

1. The parties appear to disagree as to whether

On June 20, 2002, three Great Falls Police Department officers knocked on the door of Eulalie Whitehorn's motel room in the course of investigating a highly publicized series of local art thefts. These thefts, which had taken place in March and April 2002, involved a man and woman using a baby carriage to shoplift bronzes, oil paintings, and watercolor paintings from several art stores. The missing artwork included a four-inch bronze statue. The officers had received an anonymous tip regarding Whitehorn's connection to Sherry Frasure, who had been arrested in connection with the thefts eight days earlier. They used the "knock-and-talk" procedure because the county attorney would not typically issue search warrants based on anonymous tips.

After Whitehorn answered the door, the officers explained that they were investigating the Frasure case, and they asked Whitehorn's permission to search the room. The precise content of their statements to Whitehorn is disputed. A contemporaneously prepared report and a probable cause affidavit by Officer Eric Baumann—the officer who spoke to Whitehorn at the door—record that the stated scope of the search was for "the theft of several artworks" and "stolen artwork," respectively. At the suppression hearing, Officer Baumann testified that he asked permission to search "for the stolen property that included the artworks." Officer Baumann further testified that miniature figurines and jewelry were among the items recovered from Frasure's storage units. None of the search warrants issued in connection with the Frasure investigation ever specified either jewelry or miniature figurines.

The record included several other accounts of the search's stated object. Sergeant Dan Kohm noted in a report that the stated object of the search was "any stolen items, consistent with the Frasure investigation," and he testified at the hearing that Whitehorn had given the officers permission to look "for stolen property." Detective Brian Black's probable cause affidavit indicates that the stated object of the search was "stolen items" "related" to the Frasure case. On the stand, Detective Black characterized the express object of the search several times: "We stated that we were looking at that time for any stolen property or items related to the Sherry Frasure case," "This is related to the Sherry Frasure case. All the stolen items," "We're looking for any related stolen property," and "We're looking for stolen items related to this stolen property." Based on this testimony, the district court found that the officers asked Whitehorn permission to look for "items related to the Frasure case or for stolen property," with no further definition of the object of the search.

In a zippered compartment of Whitehorn's purse, which was pushed under a bed, one of the officers found a small cylindrical mini-M & M container. He opened the container and found baggies containing what turned out to be methamphetamine inside. When confronted with the evidence, Whitehorn became upset and stated that the officers did not have permission to search in her purse.

At this point, the officers broke off the search, and Officer Baumann went to the county attorney's office to obtain a search warrant. Officer Baumann returned and stated that the county attorney's office instructed him to ask Whitehorn to sign a consent form and to return for a search warrant if she refused. Whitehorn signed

the consent to search form was designed to be retroactive or prospective in operation. We follow the approach of the district court in analyzing the consent form as relating to "the continued search following the execution of that form."

the consent form. The officers found additional methamphetamine, drug paraphernalia, and stolen property in the ensuing search.

The district court concluded that because the officers told Whitehorn that they were looking for "items related to the Frasure case or for stolen property," with no further definition of the object of the search, it was reasonable for the officers to search the purse, as well as within any item within the purse "that could contain such evidence that was or might be directly tied to the Frasure case." It also found that Whitehorn's written consent was voluntary. As a result, it denied Whitehorn's motion to suppress evidence seized both before and after the signing of the consent form.

This court reviews de novo a district court's denial of a motion to suppress. *United States v. Perez–Lopez,* 348 F.3d 839, 844 (9th Cir.2003). Whether a search exceeded the scope of a suspect's consent is a determination reviewed for clear error. *United States v. Perez,* 37 F.3d 510, 515 (9th Cir.1994). Whether a consent to search is voluntary depends upon the totality of the circumstances and is a question of fact reviewed for clear error. *United States v. Enslin,* 327 F.3d 788, 792 (9th Cir.2003).

A warrantless search of a home is presumptively unreasonable under the Fourth Amendment. *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The Fourth Amendment prohibition of unreasonable searches also protects the legitimate expectation of privacy of an occupant of a hotel or motel room. *Bailey v. Newland,* 263 F.3d 1022, 1029 (9th Cir.2001). We have also held that "[a] person has an expectation of privacy in his or her private, closed containers." *United States v. Davis,* 332 F.3d 1163, 1167 (9th Cir.2003) (quoting *United States v. Fultz,* 146 F.3d 1102, 1105 (9th Cir.1998)).

Consent to search is a well-established exception to the Fourth Amendment prohibition of warrantless searches. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Enslin,* 327 F.3d at 793. The scope of a search is defined by its expressed object. *See Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); *United States v. Gutierrez–Mederos,* 965 F.2d 800, 803 (9th Cir.1992). "[T]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno,* 500 U.S. at 251, 111 S.Ct. 1801. The stated object of the search also determines which containers an officer may inspect without exceeding the scope of a consent to search. *See id.* at 249, 111 S.Ct. 1801. It is "objectively reasonable" for a police officer to believe that a consent to search a specific area authorizes the opening of "a closed container found within [the area] that might reasonably hold the object of the search." *Id.*

■ We hold that the typical reasonable person would not understand a consent to search for "items related to the Frasure case or for stolen property" to authorize the opening of Whitehorn's mini-M & M container. The government concedes that the container in question could not hold even the four-inch bronze. The government therefore relies on the fact that stolen miniature figurines and jewelry were recovered during the search of Frasure's storage units, as well as the fact that the storage unit rentals involved receipts, to establish the objective reasonableness of the officers' search. Although jewelry and miniature figurines were recovered from Frasure's storage units, none of the search warrant affidavits for sites related to the

Frasure investigation, either predating or postdating the search of Whitehorn's motel room, ever mentioned jewelry or miniature figurines. The record does not demonstrate that a typical reasonable person—as opposed to a police officer familiar with the search of Frasure's storage units eight days earlier, as well as the inventory of items recovered therein—would understand "items related to the Frasure investigation" to include storage receipts, jewelry, or miniature figurines. Rather, the record shows that the typical reasonable person would regard "the Frasure investigation" as involving the heavily publicized string of recent *art* thefts from *art* stores. Under the objectively reasonable standard, "related" items or "stolen property" would consist of the bronzes, oil paintings, and watercolor paintings shoplifted by means of the baby carriage ruse.

■ We further hold that evidence seized pursuant to Whitehorn's written consent, given after the initial discovery of methamphetamine in the mini-M & M container, is "subject to exclusion under the Fourth Amendment as the fruit of the prior unconstitutional entry." *United States v. Jones,* 286 F.3d 1146, 1152 (9th Cir.2002). A consent to search is tainted if "the evidence indicates that it stemmed from the prior illegal Government action." *United States v. Oaxaca,* 233 F.3d 1154, 1158 (9th Cir.2000). We have explained that even a voluntary consent can be tainted because "a person might reasonably think that refusing to consent to a search of his home when he knows that the police have, in fact, already conducted a search of his home, would be a bit like closing the barn door after the horse is out." *United States v. Furrow,* 229 F.3d 805, 814 (9th Cir.2000); *see also Oaxaca,* 233 F.3d at 1159 ("[W]here, as here, the police confront a person with contraband that they have illegally found, the subsequent consent to search is fruit of the Government action.").

To dissipate the taint of the illegal search, the government must show that there was some "significant intervening time, space, or event." *Jones,* 286 F.3d at 1152 (quoting *United States v. Buchanan,* 904 F.2d 349, 356 (6th Cir.1990)) (internal quotation marks omitted). The government has not made such a showing here. Whitehorn knew that the officers had searched her purse, and she was confronted with the contraband discovered during that search. While the record is not clear as to the timing of events, no more than a few hours elapsed between the illegal search and the signing of the consent form. Therefore, no intervening event dissipated the taint of that illegality. Because we hold that the initial illegal search tainted Whitehorn's subsequent written consent, we do not reach the Fifth Amendment voluntariness question. *See United States v. Suarez,* 902 F.2d 1466, 1468 (9th Cir. 1990).

The district court erred in not suppressing evidence obtained during the searches of Whitehorn's motel room. "On direct appeal, we apply the harmless-error rule of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), which requires the error to be harmless beyond a reasonable doubt." *United States v. Bishop,* 264 F.3d 919, 927 (9th Cir.2001) (internal quotation marks omitted). The district court's error was not harmless beyond a reasonable doubt because admission of the seized drugs was crucial to Whitehorn's conviction for knowing possession of methamphetamine with intent to distribute.

For the foregoing reasons, we REVERSE Whitehorn's conviction.

ALARCÓN, Circuit Judge, dissenting.

I respectfully dissent.

This case presents a simple question: Did the district court clearly err in finding that Ms. Whitehorn gave the officers gen-

eral consent to search for "items related to the Frasure investigation or stolen property" without any limitation on the scope or nature of the search? It is undisputed that Ms. Whitehorn was acquainted with Ms. Frasure and was aware of the publicity surrounding her arrest for possession of stolen artworks. It is also undisputed that oil paintings, water colors, bronzes, miniature figurines, jewelry, glassware, and vases were recovered from Ms. Frasure's storage units. The district court's findings are supported by the testimony it found to be credible.

The majority has found that Ms. Whitehorn's consent was limited to a search for stolen "bronzes, oil paintings, and water color paintings." Majority Opinion at 7. I cannot join in the majority's opinion because it has impermissibly relied upon its own fact-finding to reject the district court's findings. Its efforts to do so are not supported by the record of the verbal exchange between the officers and Ms. Whitehorn regarding the object of the search. I would affirm the district court's judgment.

## I

### A.

Ms. Whitehorn contends that the district court clearly erred in finding that Officer Baumann requested permission to search Ms. Whitehorn's motel rooms for items related to the theft of art objects committed by Ms. Frasure or stolen property, "not solely for the purpose of finding artworks." While conceding that Officer Baumann testified at the suppression hearing that Ms. Whitehorn consented to a search for artwork or stolen property, Ms. Whitehorn contends that this testimony is not credible because Officer Baumann did not state in his police reports and in his affidavit executed on June 21, 2002, that he told her on June 20, 2002 that he wished to

search for stolen property as well as stolen artworks.

The majority has not addressed Ms. Whitehorn's contention that we must reject the district court's finding that the officers' testimony that Ms. Whitehorn consented to a search both for stolen artwork and stolen property was credible. The majority's silence is understandable. The contention is clearly contrary to the law of this circuit.

"On appeal, evidence regarding the question of consent must be viewed in the light most favorable to the fact-finder's decision." *United States v. Kaplan,* 895 F.2d 618, 622 (9th Cir.1990). "Whether a search went beyond the scope of a suspect's consent is a determination reviewed for clear error." *United States v. Perez,* 37 F.3d 510, 514 (9th Cir.1994) (citing *United States v. Huffhines,* 967 F.2d 314, 319 (9th Cir.1992)). "Review under the clearly erroneous standard is significantly deferential, 'requiring for reversal a definite and firm conviction that a mistake has been committed.'" *United States v. Elliott,* 322 F.3d 710, 714 (9th Cir.2003) quoting *United States v. Maldonado,* 215 F.3d 1046, 1050 (9th Cir.2000). "We must give special deference to the district court's credibility determination." *United States v. Haswood,* 350 F.3d 1024, 1028 (9th Cir. 2003). If "the district court's view of the evidence is plausible in light of the record viewed in its entirety, it cannot be clearly erroneous, even if the reviewing court would have weighed the evidence differently had it sat as the trier of fact." *Securities and Exchange Comm'n v. Rubera,* 350 F.3d 1084, 1094 (9th Cir.2003) (citing *Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

Before articulating its findings, the district court made the following comments:

And for purposes of findings in this case, I am, of course, obliged to evaluate

the credibility of the witnessses who appeared here and testified.

And to the extend that issues of witness credibility are raised by the evidence and can be said to be an issue in this case, the facts, as I shall state them, as I have found them, incorporate my determination of witness credibility on these issues which may be said or arguably are said to be in dispute or contested.

And of course, the record in this case consists of the testimony of the three officers who appeared here today, and the substance of their reports which were submitted as evidence, and the documents that were attached or made a part of the reports and other exhibits.

Thus, contrary to Ms. Whitehorn's assertion, the district court did not "disregard Officer Baumann's previous affidavit testimony," Appellant's Opening Brief at page 27, in assessing the credibility of his testimony at the suppression hearing. The evidence when viewed in the light most favorable to the Government, demonstrates that the district court did not err in finding that Ms. Whitehorn consented to a search of her motel rooms for artworks or stolen property.

### B.

The district court conducted an evidentiary hearing in this matter regarding the question whether Ms. Whitehorn consented to a search of her rooms at the Heritage Inn. The Government called as witnesses the three law enforcement officers who conducted the challenged search. Ms.

Whitehorn rested without presenting any defense testimony.

The record reviewed in the light most favorable to the Government discloses the following facts. On June 20, 2002, Officer Eric Baumann of the Great Falls Police Department, Detective Brian Black of the Great Falls Police Department, and Sergeant Dan Kohm of the Cascade County Sheriff's Office went to Room Numbers 291 and 293 at the Heritage Inn on June 20, 2002, to investigate whether Ms. Whitehorn had stolen property in her possession. Officer Baumann had received information from two sources that Ms. Whitehorn was an associate of Ms. Frasure. He was also informed that Ms. Frasure and Ms. Whitehorn traded narcotics for stolen property.

Officer Baumann knocked on the door of one of Ms. Whitehorn's rooms and identified himself as a police officer. Ms. Whitehorn opened the door and identified herself as Eulalie Whitehorn. Officer Baumann requested permission to enter the motel room. Ms. Whitehorn opened the door and invited the officers to come inside. Officer Baumann asked Ms. Whitehorn if she knew Ms. Frasure. Ms. Whitehorn said they were friends and that they had shopped together for antiques. Officer Baumann asked Ms. Whitehorn if she was aware of the publicity regarding Ms. Frasure's recent arrest. She stated that she was aware of it.

Officer Baumann told her he had a tip that stolen artwork was in her room. He then asked her if he could search her motel room for stolen property, including artwork.[1] Officer Baumann informed Ms.

---

1. At the suppression hearing, all three officers testified that Officer Baumann asked permission to search for stolen property, not just stolen artwork. Although Officer Baumann's police report only mentions artwork, the reports of both Sergeant Kohm and Detective Black indicate that Officer Baumann asked permission to search for stolen property. For example, Sergeant Kohm's report states that "Officer Bauman [sic] asked Eulalie if she would have a problem if we looked in her rooms for any stolen items, consistent with the Fraser [sic] investigation." Thus, the district court's finding that officers requested permission to search for any stolen property

Whitehorn that the officers did not have a search warrant and that she could refuse to allow them to enter and search her room. He also advised her that she had a constitutional right to refuse to allow the officers to search her room, and that she could revoke her consent to search at anytime. Ms. Whitehorn replied: "No problem.... I have nothing to hide." She also told the officers: "Don't mess anything up."

In Room Number 293, Office Baumann observed a nine-inch telescope on a table in plain view that when collapsed fit into the palm of his hand. Next to the telescope was a box the size of a bar of soap. Sergeant Kohm opened the box. It contained another telescope. *Ms. Whitehorn did not object to the search of the contents of the box.* The telescopes were exactly the same as those found in a storage unit rented by Ms. Frasure. Officer Baumann asked her where she had obtained the telescopes. She stated that she had bought them at a business establishment on Marketplace Square. The telescopes were seized as evidence.[2]

Ms. Whitehorn and her husband were then requested to move to Room Number 291 for the safety of the officers while they searched Room Number 293 because there were two large knives on the floor of that room.

Officer Kohm searched a purse that was on the floor. Inside were two M & M containers. Inside these containers were several baggies of methamphetamine.

During the search of Ms. Frasure's property, the officers found jewelry, glass figurines, and ornamental artwork that would easily fit in a M & M container. When the methamphetamine was shown to Ms. Whitehorn, she became irate and stated: "I didn't give you permission to go into my purse." Officer Baumann replied: "You didn't say we couldn't search in your purse."

Detective Black testified that after the methamphetamine was found in Ms. Whitehorn's purse the search stopped. The officers discussed applying for a search warrant. Ms. Whitehorn stated that she wished to cooperate and that she had a lot of information she could supply them "[b]ut everything had to stop right here, right now." After Officer Baumann left to try to obtain a search warrant, she continued to assert that "she had a lot of good information, but everything had to end right here, right now."

Officer Baumann went to the County Attorney's office to request a search warrant. A deputy county attorney requested that Officer Baumann attempt to obtain a written consent to search. He instructed Officer Baumann that, if Ms. Whitehorn refused, a search warrant would be issued. When Officer Baumann returned to the Heritage Inn, he asked Ms. Whitehorn to sign a written consent-to-search form. Ms. Whitehorn replied that she was willing to give the officers oral consent to search, but was hesitant to sign the consent form because she did not want her name leaked

---

related to the Frasure investigation is not clearly erroneous.

**2.** Ms. Whitehorn's failure to object when officers opened the telescope box is difficult to reconcile with the majority's finding that Ms. Whitehorn's consent extended only to a search for "oil paintings, watercolor paintings, and bronzes." *See United States v. Cannon*, 29 F.3d 472, 477 (9th Cir.1994) (holding

that a suspect's failure to object to the continuation of "a search after giving general consent to search is properly considered as an indication that the search was within the scope of the initial consent") (internal quotation marks omitted). A telescope is not an oil painting, watercolor, or bronze. Nor is there any evidence in the record that the four-inch bronze upon which the majority emphasis could fit within a box the size of a bar of soap.

out by some corrupt court clerk. Officer Baumann explained to her that if the officers obtained a search warrant, her name would appear in the affidavit which could be viewed by the corrupt court clerk she feared. Officer Baumann informed her that if she consented, the written form would remain in the investigative report and her identity would be withheld for a longer period of time.

Ms. Whitehorn signed the written consent form. The officers then searched the room and found several stolen items and receipts from a storage unit in her purse. In addition, the officers found additional baggies containing controlled substances, and two digital scales used for weighing narcotics.

After searching Ms. Whitehorn's motel rooms, the officers obtained a search warrant to search her storage units. They seized additional stolen property in executing the warrant.

Ms. Whitehorn did not testify at the suppression hearing.

The district court made the following findings of fact:

One. Ms. Whitehorn invited the officers to enter her motel rooms at the Heritage Inn.

Two. Ms. Whitehorn was told that she had a right not to consent to a search.

Three. Ms. Whitehorn was told that her consent to search could be revoked at any time.

Four. Ms. Whitehorn admitted that she knew Ms. Frasure and that she went "antiquing with her."

Five. The officers asked Ms. Whitehorn if she would consent to a search for items related to the theft of art objects committed by Ms. Frasure and stolen property.

Six. When asked if she would consent to a search, Ms. Whitehorn replied: "I don't have anything to hide."

Seven. Ms. Whitehorn did not place any "limits on the search at the time of granting consent."

Eight. The only restriction on the nature of the search was Ms. Whitehorn's request that the officers should not "mess anything up."

Nine: Officer Baumann observed in plain view a small telescope that was similar to one previously seized from Ms. Frasure's storage unit.

Ten. A second small telescope was found inside a box on a table at or near the door to Room 291.

Eleven: Ms. Whitehorn did not object when officers opened the telescope box to examine its contents.

Twelve: The officers did not draw their weapons when they requested consent to search.

Thirteen: Ms. Whitehorn was not under arrest when she gave consent to the search.

Fourteen: It was reasonable to search for receipts of storage lockers or units which might contain stolen property.

The district court determined that the search of the contents of her purse and the M & M containers was valid because it was within the scope of Ms. Whitehorn's general consent to the search. In denying the motion to suppress, the district court held that "there is clear and conclusive evidence that the defendant was in no way coerced at the time of signing the consent form."

The record supports each of the district court's findings. I would affirm the district court's order concerning the validity of the oral and written consent to search her motel rooms.

II

The majority has rejected the district court's credibility and factual findings. In-

stead, the majority has substituted its own findings of facts regarding the object of the search contained in Officer Baumann's consent request. After reviewing the evidence in the light most favorable to Ms. Whitehorn, the majority has found that Ms. Whitehorn did not consent to the opening of the M & M container in her purse. Majority Opinion at 6. Instead, the majority has found that Ms. Whitehorn limited her consent to a search for "bronzes, oil paintings, and water color paintings," notwithstanding the undisputed fact that jewelry and miniature figurines were recovered from Ms. Frasure's storage unit.

The majority's findings of fact are contrary to the sworn testimony of the three officers that Ms. Whitehorn authorized the search for artworks stolen by Ms. Frasure and other stolen property. Instead, the majority, in finding that Ms. Whitehorn's consent did not include a search for stolen property, or miniature figurines smaller than a four-inch bronze, relies upon allegations in Officer Baumann's affidavits used to obtain search warrants before and after Officer Baumann asked Ms. Whitehorn to consent to a search of her motel rooms.

The majority's findings of fact are contrary to its duty to view the evidence in the light most favorable to the prevailing party at a suppression hearing. *United States v. Kaplan*, 895 F.2d at 622. The majority has also ignored its duty to defer to the district court's view of the evidence "even if [it] would have weighed the evidence differently had it sat as the trier of fact." *Securities and Exchange Comm'n v. Rubera*, 350 F.3d at 1094.

The testimony that the district court found credible fully supports the district court's finding that Ms. Whitehorn's general consent to a search of her motel rooms did not exclude an inspection of the contents of her purse or any other closed container. The Supreme Court has in-

structed that, in measuring the scope of a consent to search freely and voluntarily authorized by a person, we must ask "what would the typical reasonable person have understood by the *exchange* between the officer and the suspect." *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). (Emphasis added). The majority did not limit its substituted findings of fact concerning the scope of the consent to "the exchange between the officer and the suspect." *Id.* at 251, 111 S.Ct. 1801. Instead it relies on the size of items stolen by Ms. Frasure that were sought by the officers that was not discussed in their verbal exchange with Ms. Whitehorn. We have held previously that "[t]he scope of a search is defined by its *express* object." *United States v. Gutierrez–Mederos*, 965 F.2d 800, 823 (9th Cir. 1992). (Emphasis added.) The record regarding the exchange between the officers and Ms. Whitehorn, viewed in the light most favorable to the Government, shows that the object of the officer's request was to search her motel rooms for artworks related to the thefts committed by Ms. Frasure, and any other property she had purloined. Ms. Whitehorn did not avail herself of her right to testify that her consent did not include a search of her purse or enclosed containers within it.

In *Jimeno*, the Supreme Court held that a general consent to search an automobile authorized a search of any container within the vehicle that could contain contraband. *Id.* at 251, 111 S.Ct. 1801. The Court held in *Jimeno*, that "it was objectively reasonable for the police to conclude that the general consent to search respondents' car [for narcotics] included consent to search containers within the car that might bear drugs." *Id.*

In the matter *sub judice*, the evidence viewed in the light most favorable to the Government, as the prevailing party,

shows that Ms. Whitehorn's general consent to search her motel rooms for stolen artworks and other stolen property authorized the officers to search her purse and any closed containers therein which might contain small art objects or stolen property. The record shows that the only limitation Ms. Whitehorn placed on the conduct of the officers in searching her motel rooms is that they should not "mess anything up." Assuming *arguendo* that this request was directed to the scope of the search, Ms. Whitehorn did not present any evidence that the opening of her purse or its contents created a mess. The district court's finding that Ms. Whitehorn's general consent authorized the officers to search the contents of her purse, and any other closed container in her motel rooms is compelled by the Supreme Court's decision in *Jimeno.*

### III

Ms. Whitehorn has also challenged the denial of her motion to suppress the evidence seized pursuant to her written consent on the ground that it was not free and voluntary. The district court found that the evidence produced by the Government shows that Ms. Whitehorn "express desire to cooperate with the officers, after they found the methamphetamine in her purse, and that she freely and voluntarily signed the consent to search form."

The majority has found that the "evidence seized pursuant to Whitehorn's written consent ... is 'subject to exclusion under the Fourth Amendment as the fruit of the prior unconstitutional entry.'" (citing *United States v. Jones,* 286 F.3d 1146, 1152 (9th Cir.2002)). Majority Opinion at 755. As discussed above, I agree with the district court that Ms. Whitehorn's initial voluntary consent to search for art objects and other stolen property was freely and voluntarily granted by Ms. Whitehorn. Therefore, the district court did not err in finding that Ms. Whitehorn freely and voluntarily signed the written consent form.

### CONCLUSION

When viewed in the light most favorable to the Government, the district court's finding that Ms. Whitchorn freely and voluntarily gave the officers her general consent to search her motel room for hidden stolen property, including artworks of any size or dimension, is fully supported by the evidence it found to be credible. Thus, the search of her purse for miniature artworks or figurines did not violate the Fourth Amendment. Her subsequent written consent to search was also lawful.

I would affirm the judgment of the district court.