2009 VT 51



State v. Pitts (2007-077),
(2007-219)

 

2009 VT 51

 

[Filed 22-May-2009]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions, Vermont Supreme Court, 109 State Street, Montpelier, Vermont05609-0801 of any errors in order
that corrections may be made before this opinion goes to press.

 

 


 2009 VT 51
 
  


 Nos. 2007-077 & 2007-219
 
  


 State of Vermont
 
 
 Supreme Court
 
 
  
 
 
  
 
 
  
 
 
 On Appeal from
 
 
      v.
 
 
 District Court of Vermont,
 
 
  
 
 
 Unit No. 2, Chittenden Circuit
 
 
  
 
 
  
 
 
 Yosef
 E. Pitts
 
 
 March Term, 2008
 
 
  
 
 
  
 
 
 State of Vermont
  
    v.
  
 Sequoya Pitts
  
  
 
 
  
 
 
 Linda
 Levitt, J. (motions to suppress); Mark J. Keller (final judgment 2007-077); 
 Michael S. Kupersmith
 (final judgment 2007-219)
 
 
  
 
 Thomas Donovan, Jr., Chittenden County State’s Attorney, and
Pamela Hall Johnson, Deputy

  State’s Attorney, Burlington, for Plaintiff-Appellee.

 

Anna Saxman, Deputy Defender
General, Montpelier, and Alison Arms, Office of the Public

  Defender, Burlington, for Defendant-Appellant Sequoya
Pitts, and Allison N. Fulcher of Martin

  & Associates, Barre, for Defendant-Appellant Yosef Pitts.

 

 

PRESENT:  Reiber, C.J.,
Dooley, Johnson, Skoglund and Burgess, JJ.

 

¶ 1.            
REIBER, C.J.   Defendants Yosef
and Sequoya Pitts appeal from judgments of conviction, entered upon conditional
plea agreements, for possession of illegal substances.  Each claims that the trial court erroneously denied a motion to
suppress based on an illegal search of Yosef’s person
and Sequoya’s home.[1]
 We affirm in part and reverse in part.      

¶ 2.            
The facts as revealed by the trial record and the court’s findings may
be summarized as follows.  In late December 2005, two South Burlington
police officers served a subpoena on an individual in connection with a major
drug distribution case.  The police had information that the individual in
question had sold drugs from a white Jeep, accompanied by an Hispanic male from
New York.  While serving the subpoena, the officers observed a male who
appeared to be Hispanic in the apartment.  The individual appeared to be
nervous about the officers’ presence, and had a New York accent.  He
identified himself to the officers as defendant Yosef
Pitts.  After serving the subpoena, the officers waited outside the
apartment, observed Yosef enter a taxi, and decided
to follow.  The officers called the taxi dispatcher and were informed that
the taxi was going to an address on Henry Street in Burlington and that the
taxi made the same run to the same address several times a day.  This
aroused the officers’ suspicions further because drug dealers routinely use
taxis to avoid detection.     

¶ 3.            
As Yosef exited the taxi, the officers
approached and asked if they could speak with him.  One of the officers
also asked the driver for permission to search the taxi for anything Yosef might have left inside.  Yosef
agreed to talk, and an officer asked him where he was going.  He responded
with the address on Henry Street.  The officer inquired as to whether he
had any identification; Yosef gave his name and
further explained that he was from New York but had been living in Vermont with
his sister.  The officer then asked if he had any weapons on him.
 According to the officer, Yosef told him “I
have a knife in my pocket, here,” and the officer then “took the knife off [Yosef], and .  .  .  patted him down for
weapons.”  During the pat-down search the officer felt a “big wad of cash”
and asked Yosef how much was there; Yosef indicated several hundred dollars.  The officer
then asked Yosef if he had any drugs on him.  Yosef indicated that he had “a little weed” in his pocket.  The
officer testified that Yosef “guided” him to the
location of the drugs, which the officer then removed, revealing about two
grams of marijuana.  The officer indicated that he then obtained consent
to a complete search of Yosef’s person.  When
they were done, the officers placed Yosef in their
cruiser and approached the house on Henry Street.  The officer testified,
and the court found, that their purpose in going to the house was “to
corroborate Mr. Pitts’ identity and see if there was drug use or drug dealing
within the residence.”     

¶ 4.            
Yosef’s sister, Sequoya, answered the door.
 After confirming her identity, the officers informed Sequoya that they
had Yosef outside, that he had been coming to see
her, and that they had taken a large amount of money and some marijuana from
him.  The officers sought and received permission to enter the house,
where they observed what appeared to be a marijuana roach on a dresser in the
living room.  An officer then asked for permission to search the house,
explaining that he could apply for a warrant but that it would take several
hours and require leaving an officer at the scene.  Sequoya was concerned
about the effect of the search on her son, who would soon be returning from
school, and signed a consent form allowing the search.  Among other items,
a search of the house revealed additional marijuana, cocaine, and assorted
drug-related paraphernalia.  Both defendants were subsequently charged
with possession of illegal substances. 

¶ 5.            
Yosef and Sequoya filed separate motions to
suppress the drugs and other evidence taken from the searches. Yosef claimed that he was effectively seized without
reasonable suspicion or probable cause during the encounter outside his
sister’s residence, and that all of evidence elicited as a result of the
illegal seizure must therefore be suppressed.  He also claimed that his
consent to the search of his person was in response to a “claim of lawful
authority” and therefore involuntary.  Sequoya similarly claimed that Yosef had been illegally detained without reasonable
suspicion of wrongdoing, and that the illegal detention had tainted all of the
evidence subsequently seized from her residence.  She further asserted
that her consent to the officers’ search of the residence was involuntary.
 Following a joint hearing, the trial court issued separate written
decisions.  As to Yosef, the court concluded
that the encounter with the officers was consensual and did not rise to the
level of a seizure requiring reasonable suspicion of wrongdoing, and further
concluded that Yosef had voluntarily consented to the
search of his person, finding that there was “no evidence of physical or
psychological coercion forcing Mr. Pitts to consent to the search.”  As to
Sequoya, the court concluded that she lacked standing to challenge the stop and
search of her brother, and that she voluntarily consented to the officers’
entry and search of her home.  Accordingly, the court denied the motions.
 Both defendants thereafter entered conditional pleas, reserving the right
to challenge the court’s rulings on appeal. 

I.

¶ 6.            
In reviewing a motion to suppress, we apply a de novo standard to the
trial court’s legal conclusions and a clear-error standard to its factual
findings.  State v. Lawrence, 2003 VT 68, ¶ 9, 175 Vt. 600, 834
A.2d 10 (mem.).  Yosef
contends that he was effectively seized during the encounter with the police
outside his sister’s home; that the police lacked reasonable suspicion to
justify the seizure; and that the illegality vitiated any subsequent consent to
the search of his person.  The claim requires us to determine at what
point, if any, during the encounter with the police Yosef’s
right to be free from unreasonable search and seizure was implicated.  

¶ 7.            
In balancing the individual’s right to privacy against the State’s
interest in crime prevention and detection, courts—including our own—have
distinguished various types of interactions between citizens and the police
based on the degree of police intrusion and the concomitant level of
justification required.  Both the United States Supreme Court and this
Court have recognized that a seizure does not occur when an officer merely
approaches an individual and asks certain questions, and therefore no minimal
level of suspicion of wrongdoing is necessary.  Florida v. Bostick, 501 U.S. 429, 434 (1991); Florida v. Royer,
460 U.S. 491, 497 (1983); State v. Sprague, 2003 VT 20, ¶ 26, 175 Vt.
123, 824 A.2d 539. The next level of intrusion occurs when a police officer has
reasonable and articulable grounds to suspect that an
individual is engaged in criminal activity.  In these circumstances, the
officer may briefly detain the individual to investigate the circumstances that
gave rise to the suspicion, while ensuring that the detention is “reasonably
related in scope” to the circumstances that justified it.  Terry v.
Ohio, 392 U.S. 1, 29 (1968); State v. Ford, 2007 VT 107, ¶ 4, 182
Vt. 421, 940 A.2d 687 (“Under both the Vermont and the United States
Constitutions, we have recognized that a brief detention, its scope reasonably
related to the justification for the stop and inquiry, is permitted in order to
investigate the circumstances that provoked the suspicion.” (quotation
omitted)).  A full-scale arrest or the “functional equivalent” (i.e.,
where the level of restraint has become too intrusive to be classified as an
investigative detention) requires the highest level of justification—”probable
cause” to believe that a crime has been committed.  State v. Chapman,
173 Vt. 400, 403, 800 A.2d 446, 449 (2002). 

¶ 8.            
The point at which mere questioning or “field inquiry” becomes a
detention requiring some level of objective justification is not susceptible of
precise definition.  In Terry, the Supreme Court held that a
seizure occurs “only when the officer, by means of physical force or show of
authority, has in some way restrained the liberty of a citizen.”  392 U.S.
at 19, n.16.  The oft-stated standard for deciding this question is
“whether a reasonable person would feel free to decline the officers’ requests or
otherwise terminate the encounter.”  Bostick,
501 U.S. at 436; see also United States v. Mendenhall, 446 U.S. 544, 554
(1980) (a seizure has occurred “only if, in view of all the circumstances
surrounding the incident, a reasonable person would believe that he was not
free to leave”); State v. Paquette, 151 Vt. 631, 634, 563 A.2d 632, 635
(1989) (“A Terry seizure occurs when .  .  . ‘a reasonable
person would have believed he was not free to leave if he had not responded.’”
(quoting State v. Kettlewell, 149 Vt. 331,
335, 544 A.2d 591, 593 (1987)). As the high court has observed, however, there
is no “litmus-paper test for distinguishing a consensual encounter from a
seizure.”  Royer, 460 U.S. at 506 (quoted in Sprague, 2003
VT 20, ¶ 27).  The test is “necessarily imprecise” precisely because it is
designed to assess police conduct “taken as a whole,” and therefore “what
constitutes a restraint on liberty prompting a person to conclude that he is
not free to ‘leave’ will vary, not only with the particular police conduct at
issue, but also with the setting in which the conduct occurs.”  Michigan
v. Chesternut, 486 U.S. 567, 573 (1988) (quoted
in Sprague, 2003 VT 20, ¶ 27).     

¶ 9.            
This contextual approach has led, in turn, to a recognition among many
courts that while “mere questioning” may not constitute a seizure per se,
pointed questions about drug possession or other illegal activity in
circumstances indicating that the individual is the subject of a particularized
investigation may convert a consensual encounter into a Terry stop
requiring objective and articulable suspicion under
the Fourth Amendment.  A case on point is State ex rel.  J.G.,
726 A.2d 948, 950 (N.J. Super. Ct. App. Div. 1999), where a police officer
approached two individuals in a train station and asked several questions about
their point of origin before asking the adult whether “there was anything on
him I should know about” and the juvenile whether there was “anything on him
that he shouldn’t have.”  Each responded in the negative, but assented
when the officers asked for permission to search, which revealed marijuana. 

¶ 10.         In
analyzing the defendant’s claim that he had been illegally detained, the
appeals court acknowledged that the encounter had occurred in a public place,
that no physical coercion was evident, and that the officer’s tone throughout
the incident was “unexceptional.”  Id. at 953.  It concluded,
nevertheless, that the officer’s pointed inquiries as to whether the defendant
was in possession of anything illegal made it clear that he was the “subject of
a particularized investigation by the questions presupposing the suspicion of
criminal conduct” and were “not free to leave.”  Id. at 953-54.
 At that point, the court concluded, “the field inquiry was automatically
converted to a Terry stop which would require a reasonable and articulable suspicion before the search was
conducted.”  Id.  In this regard, the court held that the
officer lacked any reasonable suspicion of wrongdoing, and that absent a basis
for the stop the subsequent search, “with or without [the defendant’s]
permission,” was invalid.  Id. at 955. 

¶ 11.         A
similar case is State v. Alvarez, 2006 UT 61, ¶ 5, 147 P.3d 425, where
two uniformed police officers approached the defendant in a parking lot and
asked whether he knew that his “vehicle was uninsured,” whether he knew that
the car was “suspected of being connected to drug dealing,” and finally whether
he “had any drugs on him.”  The court held that the officers’ inherently
“accusatory” questions about “not one, but two illegal acts”  “exceeded
‘mere questioning’ and created a confrontational encounter” which a reasonable
person would not have felt free to disregard or simply leave.  Id.
¶¶ 11-12.  As the court explained, “[t]he accusatory nature of the
questions and the context in which they were asked demonstrated a ‘show of
authority’ sufficient to restrain Defendant’s freedom of movement,” requiring a
reasonable and objective basis for the stop under the Fourth Amendment.  Id.
¶ 12.  

¶ 12.         The
Supreme Court of New Mexico confronted a similar scenario in State v. Jason
L., 2000-NMSC-018, 2 P.3d 856, where police officers observed two young men
on the street at night, one of whom appeared to be continually adjusting his
waistband.  The officers approached, asked the young men what they were
doing, were told that they were “just walking,” and then inquired if they “were
armed.”  Id. ¶ 13.  When the two failed to respond
immediately, the officers repeated the question and were told “no.”  Id. 
The officers nevertheless conducted a pat-down search, which revealed a .22
caliber pistol.  The state argued that the encounter was consensual until
the pat-down search but the court concluded that “[t]he tenor of the encounter
changed when [the officer] asked Defendant if he was in possession of weapons,”
id. ¶ 17, which, together with the suspects’ awareness that the officers
“had been observing them prior to the encounter” conveyed a clear message that
they were “not free to leave” under traditional Fourth Amendment analysis.
 Id. ¶¶ 17, 19.  Concluding that the officers lacked a
reasonable suspicion of criminal activity, the court ruled that the evidence
must be suppressed under the Fourth Amendment.  Id. ¶ 23. 

¶ 13.         Other
courts applying traditional Fourth Amendment search-and-seizure law  have
reached similar conclusions where relatively innocuous field inquiries
concerning the subject’s identity, address, or destination progress to more
pointed police inquiries about drug possession or other criminal conduct
suggesting that the person is the focus of a particularized police
investigation into criminal activity.  See, e.g., United States v. Nunley, 873 F.2d 182, 184-85 (8th Cir. 1989) (holding
that consensual encounter became seizure which invalidated subsequent consent
to search where police officers’ statements to the defendant that they were
attempting to stop the flow of drugs indicated that the defendant was the
“particular focus of a narcotics investigation”); State v. Contreras,
742 A.2d 154, 160-61 (N.J. Super. Ct. App. Div. 1999) (concluding that
narcotics officers “clearly conveyed to defendants the message that the
officers suspected them of criminal activity,” which escalated consensual
encounter to seizure where the officers had defendants exit a train, explained
that they were investigating drug trafficking, and asked defendants if they
were carrying any contraband); Parker v. Commonwealth, 496 S.E.2d 47,
49, 51 (Va. 1998) (holding that, where police clearly followed the defendant
and then “asked the defendant if he had any guns or drugs in his possession,” a
reasonable person would not have believed that he was free to leave).[2]   

¶ 14.         Assessed
in light of these standards and authorities, and viewing the encounter in its
full factual context, we conclude that a reasonable person in Yosef’s circumstances would have concluded that he was the
subject of a focused police investigation into criminal activity and was not
free to disregard the officers’ questions and requests.  The encounter
with the police, it bears emphasizing, did not begin at Henry Street, but at an
earlier time and place several miles away, where Yosef
was identified and questioned by officers serving a subpoena at a suspected
drug house.  As the officers acknowledged, their suspicions were
immediately aroused because Yosef appeared to be
nervous and matched the description of an alleged accomplice in the
drug-dealing operation.  

¶ 15.         Yosef plainly would have been aware that he was followed
across town by the same two officers, who immediately approached his taxi
driver for permission to search for anything that Yosef
might have left inside.  Although the officers’ first few questions to Yosef  were the kind that courts have uniformly held
to be innocuous and non-confrontational, they rapidly progressed to inquiries
indicating a particularized suspicion of criminal activity.  As noted, the
officer asked Yosef if he had any weapons on him,
although no circumstances suggested that he was armed.  Yosef acknowledged that he had a knife in his pocket, which
turned out to be a folding pocket knife.  The officer testified that he
then took the knife off him, patted him down for weapons, and “felt a big wad
of cash” in his pocket.  The money, according to the officer, “reinforced
my suspicion of what might possibly be going on” and he next asked Yosef whether he had any drugs on him.  Yosef again acknowledged that he did have a “little weed”
in his pocket, and the officer asked for permission to remove it, to which Yosef again assented.     

¶ 16.         While
the record reveals neither physical restraint nor blatantly aggressive or
intimidating language, these circumstances—including the fact that the suspect
was obviously  followed for a substantial distance, that his taxi was
searched, and that he was successively questioned about weapons and drugs—are
precisely the kind which courts have characterized as a particularized inquiry
into criminal activity which the average person would not have felt free to
disregard or terminate.  We conclude, therefore, that Yosef
was effectively seized for purposes of Fourth Amendment analysis.   

¶ 17.         In so
holding, we are aware of the criticism engendered by several of the Supreme
Court’s seminal decisions governing consensual encounters, particularly Bostick and United States v. Drayton, 536
U.S. 194 (2002).  In both cases, the high court held that bus passengers
subjected to organized police interrogations and searches were not detained,
and remained free to decline the officers’ requests and terminate the encounter
where the police did not block the doors to the bus or otherwise employ
physical force, weapons, or intimidating language.  See Bostick, 501 U.S. at 436-38; Drayton, 536
U.S. at 203-204; see also Mendenhall, 446 U.S. at 554  (setting
forth the criteria that might indicate a seizure, including the “threatening
presence of several officers,” the display of a weapon, physical restraint, and
the “use of language or tone of voice indicating that compliance” is
required).  These decisions have been widely criticized for propounding an
overly expansive view of the average person’s capacity to disregard or
terminate police questions and requests.  See, e.g,
D. Steinbrock, The Wrong Line Between Freedom and
Restraint: The Unreality, Obscurity, and Incivility of the Fourth Amendment
Consensual Encounter Doctrine, 38 San Diego L. Rev. 507, 521-22 (2001)
(characterizing the Supreme Court’s approach as a “fictional construct” and
“out of touch with societal reality”); R. Simmons, Not “Voluntary” But Still
Reasonable: A New Paradigm for Understanding the Consent Searches Doctrine,
80 Ind. L. J. 773, 774-775 (2005) (noting the “nearly unanimous condemnation of
the Court’s rulings on consensual searches” and criticizing the Drayton
holding as “at once absurd, meaningless and irrelevant”); I. Midgley, Comment, Just One Question Before We Get to
Ohio v. Robinette: “Are You Carrying Any Contraband, Weapons, Drugs, Constitutional
Protections, Anything Like That?”, 48 Case W. Res. L. Rev. 173, 206 (noting
the empirical research indicating that “most people believe they are in custody
as long as a police officer continues to ask them questions”); State v.
Carty, 790 A.2d 903, 910  (N.J. 2002) (observing that most citizens
would view police requests to search as having the force of law).  

¶ 18.         However
one views the Supreme Court’s approach as reflected in cases like Bostick and Drayton, we are satisfied that
our conclusion here is consistent with both cases and with subsequent Fourth
Amendment decisions applying them.  Bostick
held merely that general police questioning within the confines of a bus did
not establish a seizure “per se,” 501 U.S. at  440, while Drayton
reaffirmed that rule and added that consensual searches did not require a
police advisement that the person is free not to cooperate.  536 U.S. at
206-207.   Although both cases involved potentially incriminating
questions put to passengers by officers who had identified themselves as
narcotics agents on the lookout for illegal drugs, there was nothing in the
encounters to suggest a particularized suspicion of wrongdoing among any of the
passengers questioned.  Courts have therefore had little difficulty
distinguishing Bostick and its progeny from
situations where, as here, the officers’ questions and the surrounding
circumstances combine to make the defendant “aware that he was the subject of a
particularized investigation.”  State ex rel. J.G., 726 A.2d at 954
(distinguishing Bostick where the officer’s
conduct and questions indicated that the defendant “was or might be involved in
criminal conduct” and was “not free to leave”); Alvarez, 2006 UT, ¶ 12
(distinguishing “mere police questioning” in Bostick
from questioning where “[t]he accusatory nature of the questions and the
context in which they were asked demonstrated a show of authority sufficient to
restrain Defendant’s freedom of movement” (quotations omitted)). 

¶ 19.         Other
courts, to be sure, have reached similar holdings in reliance solely on state
law, implicitly or expressly acknowledging the criticism of the high court’s
approach.  See, e.g., State v. Quino, 840
P.2d 358, 359 (Haw. 1992) (relying on state constitution to hold that, although
no physical force was used, defendant was effectively seized when “general”
questioning by narcotics detectives turned to “inquisitory”
questions about possession of drugs); People v. Hollman,
590 N.E.2d 204, 210 (N.Y. 1992) (relying on state common law to hold that field
inquiry by narcotics officers in a bus terminal escalated into investigative
detention requiring reasonable suspicion when officers requested consent to
search for drugs).  This Court has also consistently held that Chapter I,
Article 11 of the Vermont Constitution provides a defense against invasions of
privacy equal to or, in some cases greater than, the Fourth Amendment to the
United States Constitution, and we have regularly invoked this principle to place
reasonable restrictions on the scope of police authority to detain and search
citizens.  See, e.g., Sprague, 2003 VT 20, ¶ 16 (rejecting federal
rule to conclude, under Article 11, that exit order during routine motor
vehicle stop is a seizure requiring independent suspicion of criminal activity
or reasonable concern for safety of officer); State v.  Morris, 165
Vt. 111, 125, 680 A.2d 90, 100 (1996) (declining to follow United States
Supreme Court decision allowing warrantless search of trash); State v. Kirchoff, 156 Vt. 1, 7, 587 A.2d 988, 992 (1991)
(rejecting United States Supreme Court open fields doctrine).  Consistent
with these settled principles we conclude that Yosef
was effectively seized under the Vermont Constitution as well, and that the
police therefore required a reasonable and objectively based suspicion that he
was engaged in criminal activity.  Ford, 2007 VT 107, ¶ 4. 

¶ 20.         As
the State acknowledged at oral argument, however, the officers here were
operating solely on a hunch; there was no reasonable and objective basis to
suspect that Yosef was then in possession of illegal
drugs or engaged in any other criminal activity sufficient to justify an
investigative detention.  The detention was plainly invalid, therefore,
and it is equally plain that the illegal detention irremediably tainted the
consensual search of Yosef’s person which immediately
followed.  See Royer, 460 U.S. at 507-08 (where defendant was
illegally detained when he consented to search of luggage “the consent was tainted
by the illegality and was ineffective to justify the search”); Sprague,
2003 VT 20, ¶ 32 (invalidating consent search where there were no attenuating
circumstances or “intervening events” between driver’s illegal detention and
subsequent consent that would obviate the taint of illegality).  
Accordingly, all of the evidence seized from Yosef
should have been suppressed.    

¶ 21.         In
addition to the evidence illegally obtained from his person, Yosef claims that the cocaine and marijuana subsequently
seized from the search of the residence should have been suppressed as the
tainted “fruit” of the initial illegality.  Wong Sun v. United States,
371 U.S. 471, 488 (1963); State v. Phillips, 140 Vt. 210, 218, 436 A.2d
746, 751 (1981).  He essentially argues in this regard that, but for the
evidence taken from his pockets, the police would not have approached his
sister’s house, sought and obtained entry, and discovered the additional drugs
in the ensuing search.  The record evidence does not support the claim.
 The investigating officer here testified that they approached the house
to “[v]erify [Yosef’s] ID
and continue investigating whether this was some kind of drug operation.” 
When the question was then posed, “if you hadn’t talked to Yosef,
you would have had no reason to go to 13 Henry Street,” the officer initially
responded “correct” but then qualified his response by recalling the
information they had received earlier from the taxi company.  In essence,
the officer indicated that their interest in the house flowed from the taxi
dispatcher’s initial identification of 13 Henry Street as the address where a
taxi was regularly sent from a suspected drug-dealing operation in Burlington.
 Their suspicions were aroused, the officer explained, because drug
dealers regularly travel in taxis between locations to avoid police detection.
 Thus, the officers had ample information independent of the money
and drugs seized from Yosef to investigate the
residence.  That evidence did not, therefore, taint the additional
evidence seized from the house, and its suppression was not required.  See
Phillips, 140 Vt. at 218, 436 A.2d at 751 (in determining “fruits” of
the initial illegality, critical inquiry is whether the evidence “‘has been
come at by exploitation of that illegality, or instead by means sufficient
distinguishable’” (quoting Wong Sun, 371 U.S. at
488)).     

¶ 22.         Yosef was charged with one count of possession of less than
two ounces of marijuana and one count of possession of cocaine.  Having upheld
the search of the house from which the cocaine was seized, we find no basis to
disturb the possession-of-cocaine conviction.   The record is
unclear, however, whether the possession-of-marijuana charge was based on the
evidence illegally seized from Yosef’s person or the
marijuana legally seized from the house.  Accordingly, the matter must be
remanded to the district court for further proceedings to address this issue
and make any necessary modifications to the judgment and sentence.

II.

¶ 23.         Turning
from Yosef to Sequoya, we note that the latter also
relies on the allegedly illegal detention of Yosef to
support her claim that the evidence subsequently seized from the residence was
tainted by the initial illegality and therefore should have been
suppressed.  The claim raises an interesting question concerning Sequoya’s
standing to assert the illegal detention of Yosef,
but we deem it unnecessary to resolve the issue.  For even assuming that
Sequoya had standing under these circumstances, the record—as discussed
above—does not establish the necessary causal nexus between the illegal
detention of Yosef and the evidence subsequently
seized from the house.  Moreover, contrary to Sequoya’s corollary claim,
we conclude that the evidence supports the trial court’s finding that Sequoya
voluntarily consented to the officer’s entry and search of the
house.    

¶ 24.         As we
have explained, “the inquiry in a consent search context is restricted to
whether the consent was voluntary, not whether there was a ‘knowing and
intelligent’ waiver of a constitutional right.”  State v. Zaccaro, 154 Vt. 83, 88, 574 A.2d 1256, 1259 (1990)
(citation omitted); accord State v. Stevens, 2004 VT 23, ¶ 11, 176 Vt.
613, 848 A.2d 330 (mem.); Sprague, 2003 VT 20,
¶ 23.  Voluntariness is to be determined from the totality of the
circumstances, with the State carrying the burden “of demonstrating that the
consent was freely given and not coerced by threats or force, or granted only
in submission to a claim of lawful authority.”  Sprague, 2003 VT
20, ¶ 23 (quotation omitted).  

¶ 25.         The
court here found that, when Sequoya answered the door, the officer asked if he
could come in and talk to her and “[s]he said he could.”  The court
further found that 

[u]pon stepping over the threshold, the officer began to tell
[Sequoya] about the marijuana and cash found on her brother.  From his
location he could observe a marijuana roach on a dresser in the living room.
 He asked [Sequoya] if he could search the home based on the presence of
marijuana.  After the defendant said she wasn’t sure, [the officer] said
he would seize the residence and apply for a search warrant.

 

 
[Sequoya] decided to consent to the search.  She knew that a search
warrant might take hours to obtain and she didn’t want her young son to have to
stay at another residence while waiting for the warrant.

 

Sequoya signed a
consent-to-search form, indicating that she had freely given permission to
search the house and that no threats or promises had forced her
consent.   

¶ 26.         Although
she did not argue below that her consent to the entry was involuntary, Sequoya
asserts on appeal that this Court should adopt a special standard, requiring
the police to expressly inform a resident of his or her right to refuse consent
as a precondition to a residential search in these circumstances.  Sequoya
relies in this regard on State v. Ferrier, 960 P.2d 927  (Wash.
1998), a ruling in which the Washington Supreme Court criticized the so-called
“knock and talk” procedure whereby the police ask a resident if they may enter
a residence to talk about a matter and once inside seek permission to
search.  The Washington court found this common technique to be
“inherently coercive to some degree,” id. at 933, and held “that when
police officers conduct a knock and talk for the purpose of obtaining consent
to search a home, and thereby avoid the necessity of obtaining a warrant, they
must, prior to entering the home, inform the person from whom consent is sought
that he or she may lawfully refuse to consent to the search and that they can
revoke, at any time, the consent that they give, and can limit the scope of the
consent to certain areas of the home.”   Id. at
934.         

¶ 27.         Whatever
the merits of the Ferrier decision, we need not address its application
on the facts presented here.[3] 
First, the argument was not raised below, and therefore need not be addressed
on appeal absent a showing of plain error.  State v. Lee, 2008 VT
128, ¶ 11, ___ Vt. ___, 967 A.2d 1161 (we review arguments not raised initially
in the trial court solely for plain error amounting to a miscarriage of
justice). Second, even considered on its merits the Ferrier decision is
inapposite.  The Washington court was careful to limit its holding to
circumstances where, as the evidence there showed, the police conducted the
knock and talk for the express “purpose of obtaining consent to search a
home.”  Ferrier, 960 P.2d at 934.  Indeed, in a later decision
the same court held that a “Ferrier warning” before entry is not
required when the police seek merely to speak to a resident in the course of a
criminal investigation and not “for the purpose of obtaining consent to a
warrantless search.” State v. Khounvichai, 69
P.3d 862, 867 (Wash. 2003).  Here the officers’ stated intentions were to
confirm Yosef’s identity and continue their
investigation into drug dealing.  Sequoya does not claim, nor does the
record show, that the police sought entry for the purpose of conducting a
warrantless search.  Indeed, the undisputed evidence reveals that the
search request occurred only after the officers entered and observed marijuana
in plain view.   Accordingly, we find no grounds to require a
pre-entry warning. 

¶ 28.         Nor
do we discern any basis to disturb the trial court’s finding that
Sequoya’s  consent to the subsequent search of her house was
voluntary.  Sequoya claims that her consent was coerced by police statements
indicating that they would effectively “seize” the house for several hours if
required to spend time applying for a warrant.  In this regard Sequoya
testified, and the court found, that she was concerned her eight-year-old son
would arrive while the police were applying for the warrant and that he would
be forced be go elsewhere.  She also testified that she consented to the
search because she “was scared,” but added that she “thought it was the right
thing to do” and that if she withheld consent the police would “lock down the
house” and her son would be “out in the cold.”     

¶ 29.         The
record here contains no evidence that the police coerced Sequoya’s consent to
search through the use of physical force, threats, or intimidation.  Nor
did Sequoya’s concern that withholding consent might inconvenience her son
amount to the sort of psychological pressure that courts view as impermissibly
coercive.  Cf. United States v. Ivy, 165 F.3d 397, 404 (6th Cir.
1998) (defendant’s consent to search of home held to be involuntary where
police handcuffed his girlfriend to a chair for an hour and a half and
periodically removed their baby threatening to place it in protective custody
unless he consented); People v. Haydel, 524
P.2d 866, 871 (Cal. 1974) (consent held to be product of “psychological
coercion and involuntary” where it was induced by police promises to release
wife and son from custody).  

¶ 30.         Of
more concern is whether the officers’ statements that they would apply for a
warrant if Sequoya withheld consent rendered the consent involuntary by
implying that any refusal would be futile.[4]  A substantial number of cases and
commentators have considered this issue.  One leading authority has
summarized the law by observing that consents given in response to police
statements indicating an intent “to seek a warrant have been upheld as
voluntary” while threats “to obtain” a warrant may present a closer
question, particularly where legal grounds for the warrant are lacking.  4
W. LaFave, Search & Seizure § 8.2(c), at 70, 72
(4th ed. 2004).  The former may be said to describe what will occur in the
event of a refusal, while the latter may be an overstatement of authority “by
suggesting that a search is inevitable and that the withholding of consent will
be futile.”  Commonwealth v. Mack, 796 A.2d 967, 973 (Pa. 2002)
(Saylor, J., concurring); see also United States v. Larson, 978 F.2d
1021, 1024 (8th Cir. 1992) (collecting cases holding that consent is not
coerced where police indicate that they would attempt to obtain a warrant if
defendant refused consent); United States v. Garcia, 890 F.2d 355,
361-62 (11th Cir. 1989) (police statement that if defendant refused consent
they “would have to secure the house and apply for a search warrant” held not
to be coercive); Dotson v. Somers, 402 A.2d 790, 794 (Conn. 1978) (“the
intimation that a warrant will automatically issue is as inherently coercive as
the announcement of an invalid warrant”); Daniel v. State, 582 N.E.2d 364,
369 (Ind. 1991) (consent to fingerprinting not vitiated where police advised
defendant that a search warrant “would be sought” in the event of a refusal); State
v. Patch, 702 A.2d 1278, 1282 (N.H. 1997) (police statement that they would
apply for a warrant if defendant refused consent was merely “[i]nforming the defendant of
viable alternatives” and did not render consent involuntary).

¶ 31.         The
officer here testified that he told Sequoya that he thought he had probable
cause “to seize the residence and apply for a search warrant,” and the court so
found.  Thus the  officer did not communicate that a warrant would
automatically issue regardless of Sequoya’s decision or that her refusal would
be a futile gesture; rather, he indicated truthfully and accurately that a
refusal would result in an application for a search warrant involving the
submission of an affidavit.  Accordingly, in conformity with the weight of
authority, and absent other evidence of coercion, we discern no ground to reverse
the court’s conclusion that the consent to search was voluntary, and therefore
no basis to disturb the judgment of conviction of Sequoya. [5]      

Affirmed in
part, reversed in part, and remanded for further proceedings consistent with
the views expressed herein.

 

 

                                                                       
FOR THE COURT:

 

                                                                       
____________________________________

                                               
                       
Chief Justice

 

 

¶ 32.         JOHNSON,
J., concurring and dissenting.  I concur with the majority’s holding
that Yosef was unlawfully detained and searched, but
I would hold further that police exploited that unlawful detention and search
to gain entry to Sequoya’s home and obtain evidence connected to the prior
search.  I find no legal rationale to support excluding evidence taken
from an unlawful search of the targeted drug dealer, but then admitting related
evidence obtained from the home of the suspect’s sister in a follow-up
investigation mere minutes after the unlawful search.  Under the
applicable law, that latter evidence is plainly tainted by the unlawful search
and therefore not admissible.  Even if Sequoya’s consent could be
considered voluntary under ordinary circumstances, it was insufficient to purge
the taint resulting from the previous unlawful search that led police to her
home.  Accordingly, I would reverse both convictions.

¶ 33.         As an
initial matter, before addressing Sequoya’s claim that the evidence seized from
her residence was tainted by the prior unlawful search of Yosef,
I see no merit to the State’s contention that Sequoya lacks standing to make
this claim.  Assuming that Sequoya requires independent standing to rely
upon an illegality already found by this Court in the companion case against Yosef, her standing under the circumstances of this case is
apparent.  To establish standing for the assertion of an Article 11 violation
committed against another person, “a defendant need only assert a possessory,
proprietary or participatory interest in the item seized or the area
searched.”  State v. Wood, 148 Vt. 479, 489, 536 A.2d 902, 908
(1987).  This is a broader standard than the “expectation of privacy” test
employed by the federal courts under the Fourth Amendment.  As we
explained in State v. Welch, 160 Vt. 70, 77, 624 A.2d 1105, 1109 (1992),
“we look at the objective relationship of the person to the place searched or items
seized, as opposed to a subjective evaluation of the legitimacy of the person’s
expectation of privacy.”

¶ 34.         In
support of her standing claim, Sequoya asserts not only a possessory interest,
but also a participatory interest, which we defined in Welch as “ ‘connot[ing] some involvement in the underlying criminal
conduct’ that generated the seized evidence.”  Id. (quoting State
v. Mollica, 554 A.2d 1315, 1321 (N.J.
1989)).  Sequoya’s alleged “involvement in the underlying criminal conduct
that generated the evidence” is not difficult to discern from the record. 
The investigating officer readily acknowledged his suspicion that the cash and
drugs seized from Yosef represented evidence of “some
kind of drug operation” potentially involving Sequoya, with whom Yosef was staying.  Indeed, immediately following the
illegal detention and search of Yosef, the officer
approached Sequoya’s home to further his investigation of drug dealing and
confirm his suspicions that had been further aroused by the evidence taken from
Yosef.  As it turned out, based on the discovery
of drugs and other contraband subsequently seized from the house, which were
linked to the evidence seized from Yosef minutes
earlier, the investigating officer alleged in his affidavit of probable cause
that “Miss Pitts . . . and [Y]osef Pitts are
conspiring to transport large quantities of cocaine to Vermont for sale.”
 The record thus amply supports Sequoya’s claim to participatory standing
to assert the illegal detention of Yosef as a basis
to suppress all of the evidence that flowed therefrom.

¶ 35.         Indeed,
the State does not even contest that Sequoya has participatory standing, but
rather argues only that she failed to claim participatory standing before the
district court.  This argument is unavailing.  Sequoya explicitly claimed standing, citing the
applicable test set forth in Wood and noted above.  Although she
did not specify why in this case she had participatory, as opposed to
possessory, standing, the State did not contest her standing on any basis, and
the district court ruled only that she did not have possessory standing. 
Under these circumstances, we should consider the argument properly preserved;
but even if we did not, it would be plain error not to recognize her obvious
participatory standing.  See State v. Mayo, 2008 VT 2, ¶ 9, 183 Vt.
113, 945 A.2d 846 (stating test for finding plain error).

¶ 36.         Regarding
the merits of Sequoya’s taint argument, the majority concludes that (1) the
record does not establish a causal nexus between Yosef’s
illegal detention and the seizure of evidence from Sequoya’s home; and (2) the
record supports the trial court’s finding that Sequoya voluntarily consented to
the search of her home.  In reaching these conclusions, the majority
considers whether Sequoya voluntarily consented to police entering and
searching her home as if her consent were completely independent of the prior
illegal detention and search of her brother.  That is inconsistent with
the applicable standard of review:

Although, to be
sure, evidence obtained by means of a valid consent following an illegal
detention may in some circumstances be admissible where the casual nexus with
the original illegality is sufficiently attenuated, the voluntary nature of any
consent that follows must necessarily be established by the State with clear
and positive evidence.

 

State v.
Sprague, 2003 VT 20, ¶ 31, 175 Vt. 123, 824 A.2d 539 (emphasis added;
citation omitted); see United States v. Sanchez-Jaramillo, 637 F.2d
1094, 1099 (7th Cir. 1980) (“The government bears a heavy burden of
demonstrating that consent given subsequent to an illegal detention was
properly obtained.”); State v. Arroyo, 796 P.2d 684, 687-88 (Utah 1990)
(“When the prosecution attempts to prove voluntary consent after an illegal
police action . . . the prosecution has a much heavier burden to satisfy than
when proving consent to search which does not follow police misconduct.”
(quotation omitted)).

¶ 37.         Neither
the trial court nor the majority have examined Sequoya’s consent under this
more onerous standard in light of the prior illegal activity.  Cf. Sprague,
2003 VT 20, ¶ 31 n.2 (concluding that defendant’s multiple consents to search
following illegal police conduct were tainted and ineffective, and noting that
trial court found consents to be voluntary without considering them “in the
context of the immediately preceding illegal seizure”).  Examined in light
of the proper standard, the record reveals that the State has failed to meet
its heavy burden of demonstrating by clear and positive evidence that police
obtained from Sequoya’s home, via her consent, evidence that was not tainted by
the unlawful detention of Yosef immediately preceding
the search of her home.

¶ 38.         The
leading commentator on search and seizure law has noted that, when confronted
with the question of whether to admit physical evidence obtained by a purported
consent following some form of illegal police activity, some courts have
focused on the voluntariness of the consent, while others have sought to
determine if the evidence was tainted by the prior illegality.  4 W. LaFave, Search & Seizure § 8.2(d), at 76 (4th ed.
2004).  Professor LaFave has emphasized that the
issues are not identical and that evidence obtained by a purported consent
following illegal police activity “should be held admissible only if it is
determined that the consent was both voluntary and not an exploitation
of the prior illegality.”  Id.  Thus, while consent certainly
could be deemed involuntary due to the taint of prior unlawful police conduct
and other relevant circumstances, the consent need not be involuntary for the
taint from the prior unlawful conduct to be sufficient to require suppression
of evidence obtained as the result of that consent.  Id. at 76-77;
see Brown v. Illinois, 422 U.S. 590, 601-02 (1975) (rejecting notion
that confession obtained after illegal arrest is untainted merely because it
was voluntary in Fifth Amendment sense); State v. Furrow, 229 F.3d 805,
813 (9th Cir. 2000) (“The mere fact of voluntariness does not mean that a
consent is not tainted by a prior Fourth Amendment violation.”).  The
latter situation may occur “when the pressure upon the person from the prior
illegality is not so great that his will has been overborne . . . ,
but yet it cannot be said . . . that his consent was sufficiently an act of
free will to purge the primary taint.”  4 LaFave,
supra, at 77-78 (quotation omitted).  The ultimate question is
whether the challenged evidence was obtained by exploitation of previous
unlawful police conduct or by means sufficiently distinguishable so as to purge
the primary taint of the prior illegality.  Id. at 76; see State
v. Phillips, 140 Vt. 210, 218, 436 A.2d 746, 751 (1981) (courts must
determine whether challenged evidence resulted from exploitation of prior
illegality or rather from “ ’means sufficiently distinguishable to be
purged of the primary taint.’ “ (quoting Wong Sun v. United States, 371
U.S. 471, 488 (1963))).

¶ 39.         Several
factors come into play in making this determination in the context of a consent
to search following unlawful police conduct.  Chief among them are (1) the
temporal proximity of the illegal detention in relation to the consent, and (2)
the presence of any intervening circumstances occurring between the illegal
activity and the consent sufficient to erase the taint from the illegal
activity.  See Sprague, 2003 VT 20, ¶ 31; see also United States
v. Hernandez, 279 F.3d 302, 308-09 (5th Cir. 2002) (citing as factors
temporal proximity, intervening circumstances, and whether police conduct was
flagrant); 4 LaFave, supra, at 82-84 (noting
factors that United States Supreme Court has cited in determining whether
consent is tainted by prior police illegality: proximity of consent to illegal
conduct; whether illegal conduct resulted in police observation of object to
which consent to search was obtained; whether illegal conduct was flagrant;
whether consent was volunteered or requested; whether person consenting was
aware of right to refuse to consent to search; whether significant intervening
events occurred; and whether purpose underlying illegality was to obtain
consent to search).

¶ 40.         Each
of these factors militate in favor of Sequoya in this case, precluding the
State from meeting its heavy burden of demonstrating that its prior illegal
activity did not taint its subsequent search of Sequoya’s home.  This is
not a situation, as in Phillips, 140 Vt. at 219, 436 A.2d at 751, where
the police obtained the challenged evidence through a search “made with
probable cause, based on information received totally independently of” the
claimed illegality.  To the contrary, the record reveals, as acknowledged
by the trial court and the majority, that the investigating officer approached
Sequoya’s home immediately following his unlawful investigatory detention and
search of Yosef, during which he discovered evidence
that further aroused his suspicions of drug activity at Sequoya’s home. 
The officer testified at trial that he approached Sequoya’s home to verify
information that Yosef had provided during the
illegal detention and to “continue investigating whether this was some kind of
illegal drug operation.”  It could not be more plain that the illegal
detention and search of Yosef, and the resulting
recovery of drugs and cash on his person, led police to approach Sequoya’s
residence and make further investigatory inquiries based on aroused suspicions
of a drug operation at the house.  See 4 LaFave,
supra, at 88 (“If . . . the prior illegal search provides a significant
lead in terms of indicating what other evidence [police] ought to seek or where
they ought to seek it, or if the illegal search provided the means of gaining
access to the person from whom the consent was obtained, then a consent
obtained by exploitation of that information would constitute a fruit of the
earlier illegal search.”).

¶ 41.         The
majority attempts to deny the apparent connection between the illegal police
conduct and the search of Sequoya’s home by pointing to a single line of
testimony by the investigating officer, who initially agreed that he would not
have had any reason to go to Sequoya’s home if he had not talked to Yosef, but then appeared to qualify that response by
stating: “Well, other than the cab driver telling me.”  This single
statement is not “ample” information demonstrating an independent basis for
police to approach and search Sequoya’s home, as the majority states, ante,
at ¶ 21, and hardly satisfies the State’s heavy burden of showing, by clear and
positive evidence, the absence of taint following the illegal police
conduct.  On the whole, the record does not support speculation that the
police would have approached Sequoya’s house to confirm Yosef’s
identification or further investigate drug dealing based solely on the cab
dispatcher’s statement, absent the statements made by Yosef
and the evidence seized from him following his unlawful detention.  This
is borne out by the fact that, upon arriving at the house, the officer
immediately told Sequoya that he had her brother outside and had found drugs
and a significant amount of money on him.  In any event, it is undisputed
that the police approached Sequoya’s house immediately following the unlawful
detention and search of Yosef; thus, the temporal
proximity factor must be weighed in favor of Sequoya.

¶ 42.         Nor
can the State reasonably claim that there were any intervening factors that
purged the taint.  While the investigating officer noticed what he
believed to be a marijuana roach in plain view once he crossed the threshold of
the house, the evidence is equivocal at best from the State’s
perspective—certainly not clear and positive—as to what the officer said before
Sequoya consented to his entry into her home.  On this point, the officer
testified, “I asked her if I could come in and talk to her.  She said
yes.  And I told her what it was about.  You know, that Yosef was coming up there, and he had a large amount of
money and marijuana.”  Later, however, on cross-examination, the officer
testified that when he asked Sequoya if he could come in, she asked “what was
it about.  I told her it was about Yosef.” 
According to the officer, he told Sequoya that Yosef
“had a little weed on him, and he was coming upstairs.”

¶ 43.         While
not absolutely clear, the record thus fairly indicates that, before seeking
entry, the officer informed Sequoya that he was there because of the money and
drugs seized from Yosef.  This interpretation of
the officer’s testimony is further supported by Sequoya’s testimony, who
recalled that, when she came to the door, the officer informed her that “he had
[her] brother downstairs,” that she then asked him “ ‘For what? What happened?’
And he said, um, ‘He had weed on him, and a large amount of money.’ “  The
officer then asked her for identification, she found a learner’s permit to show
him, and “that’s when he asked if he could come in, maybe.”  She explained
that she acquiesced to his request because she was afraid that her brother was
going to jail.  Although the trial court’s findings suggest, without
explicitly stating, that the officer stepped “across the threshold” before
explaining the reasons for his visit, the record does not support this sequence
of events.

¶ 44.         But
even if it did, the State failed to meet its heavy burden of demonstrating that
the extension of the police investigation to Sequoya’s home and the subsequent
discovery of drugs there did not result from exploitation of the immediately preceding
unlawful detention and search of Yosef.  The
record plainly reveals that the police gained entry to Sequoya’s home largely
through exploitation of the original illegality—by using the fruits of the
illegal detention and search of Yosef as leverage to
obtain Sequoya’s acquiescence in the officer’s request.  Cf. Hernandez,
279 F.3d at 308-09 (concluding that although defendant voluntarily consented to
having police search her suitcase, the consent and ensuing search resulted from
exploitation of prior unlawful police conduct related by temporal proximity and
unbroken by intervening events); United States v. Oaxaca, 233 F.3d 1154,
1158 (9th Cir. 2000) (concluding that sister’s consent for police to search her
home immediately following her brother’s illegal arrest was voluntary but
tainted by illegal police conduct).  In short, absent the drugs and money
recovered illegally from Yosef, it is difficult to
imagine that the police would have sought permission to enter the house so
persistently, or that consent would have been obtained so readily.

¶ 45.         Given
the record before us, there is some doubt about the voluntariness of Sequoya’s
consent to search her home.  The investigating officer testified that he
told Sequoya he had probable cause to obtain a search warrant and seize her
apartment in the interim.  In his affidavit of probable cause, he stated:
“I told her that [seeing the roach] gives me probable cause to believe that
there may be more drugs here.  We have a problem with people from NY bringing
large amounts of drugs here.”  He further averred as follows:

I continued
explaining to her that I believed that I had probable cause to seize the
apartment.  She could consent to a search or request that I write an
affidavit for a search warrant.  If you chose that route it does not mean
that I am going to leave you alone here for two hour[s] while I go write an
affidavit. . . . I asked her how she wants to do this.

 

Sequoya testified
that she consented to the search because her son was coming home soon and she
did not want him to witness the search and be locked out of his home.

¶ 46.         These
facts make the voluntariness of Sequoya’s consent at least questionable, but
even assuming that the trial court correctly ruled that there was no coercion
and that the consent was voluntary, surely the State has failed to demonstrate
an absence of taint resulting from the prior illegal search.  For these
reasons, I would conclude that the evidence seized from the house was illegally
obtained and should have been suppressed.

¶ 47.         I am
authorized to state that Justice Skoglund joins this
dissent.

 

                                                                       
____________________________________

                                                                       
Associate Justice

 











[1] 
We refer to defendants by
their first names solely for purposes of clarity.





[2] 
We faced a somewhat similar
issue in State v. Hollister, 165 Vt.
553, 679 A.2d 883 (1996) (mem.), where police
officers observed two young men, including defendant, outside a library where a
cherry bomb had exploded.  The officers approached the two and asked what
they were doing.  During the conversation, an officer noticed the smell of
alcohol on defendant, who admitted that he had been drinking.  The officer
asked if he could look in defendant’s knapsack and then asked if the young men
“had anything in their pockets that they should not have” and whether he could
see.  Id. at 553, 679 A.2d at 884.  Defendant and the other
young man then produced several baggies of marijuana.  Although Justice
Johnson would have held that the defendant was seized when the officer began to
ask incriminating questions about illegal activity, id. at 554-55, 679
A.2d at 884 (Johnson, J., dissenting), the Court declined to reach the issue,
conceding that there was a seizure but ruling that it was a legitimate Terry
stop based on the reasonable suspicion of criminal activity, to wit possession
of alcohol by a minor.  Id. at 553, 679 A.2d at 884.





[3] 
We note, however, that many other jurisdictions have rejected the assertion
that the knock-and-talk approach is inherently coercive or compels a special
warning on the right to refuse consent.  See, e.g., United States v.
Chambers, 395 F.3d 563, 567 n.2 (6th Cir. 2005) (“Courts generally have
upheld [the knock-and-talk] investigative procedure as a legitimate effort to
obtain a suspect’s consent to search.”); United States v. Jones, 239
F.3d 716, 720 (5th Cir. 2001) (“Federal courts have recognized the ‘knock and
talk’ strategy as a reasonable investigative tool when officers seek to gain an
occupant’s consent to search or when officers reasonably suspect criminal
activity.”); Perkins v. Commonwealth, 237 S.W.3d 215, 219 (Ky. Ct. App.
2007) (“Many courts  .  .  .  have recognized the
legitimacy of knock-and-talk encounters at the home of a suspect or another
person who is believed to possess information about an investigation.”).  





[4] 
Although Sequoya did not develop this point at any length below, she did claim
that the officer’s threat to obtain a warrant rendered her consent
involuntary.  





[5] 
We note that Sequoya’s testimony differed from the officer’s, as she recalled
that the officer stated “he would get a warrant” if she refused consent.
 (Emphasis added).  The trial court, however, was entitled to credit
the officer’s version, and there is no argument or showing here that the
finding was clearly erroneous.  See State v. Dixon, 2008 VT 112, ¶
34, ___ Vt. ___, 967 A.2d 1114 (it is the trial court’s province to weigh the
evidence and we will not reevaluate conflicting testimony or witness
credibility).  We note, as well, that numerous courts, including our own,
have upheld consensual searches under similar circumstances where an officer’s
statement that he would get or obtain a warrant is supported by probable
cause.  See State v. Sole, 2009 VT 24, ¶ 30, ___Vt. ___, ___A.2d
___ (assuming that police officer told the defendant that a warrant was likely
or sure to issue, there was no coercion where his belief was well founded);
accord State v. Ballou, 186 P.3d 696, 701
(Idaho Ct. App. 2008) (“Many jurisdictions have concluded that, if officers
have probable cause to obtain a warrant, telling a suspect that they will
obtain a warrant if consent is refused does not vitiate the suspect’s consent
to search.”); accord United States v. Marshall, 348 F.3d 281, 286 (1st
Cir. 2003); United States v. Meza-Corrales, 183 F.3d 1116, 1125 (9th
Cir. 1999); United States v. Salvo, 133 F.3d 943, 954 (6th Cir. 1998); State
v. Owens, 418 N.W.2d 340, 344 (Iowa 1988); see generally 4 W. LaFave, supra, § 8.2(c) at 72, 73-74 (noting that a
threat to obtain a warrant “is often said .  .  .  not [to be]
per se coercive” and is “likely not to affect the validity of the consent if
the police then had probable cause upon which a warrant could issue.”). 
Here, apart from any other information the officers’ had obtained earlier,
their plain-view observation of the marijuana in Sequoya’s hall was sufficient
to establish probable cause for a search warrant.  See State v.
Melchior, 172 Vt. 248, 252-53, 775 A.2d 901, 905 (2001) (officer’s
affidavit that, based upon his training and experience, he observed what
appeared to be marijuana in field was sufficient to support finding of probable
cause to believe that a crime had been committed and that evidence of the crime
would be found in the place to be searched).